ORIGINAL

FILED
AUG 2 4 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC<br>A Mississippi Limited Liability Corporation,<br>Plaintiff,<br><br>VS.<br>THE UNITED STATES,<br>UNITED STATES DEPARTMENT<br>OF THE AIR FORCE<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 07-630 C |

**APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

TO THE HONORABLE JUDGE OF THE U.S. COURT OF FEDERAL CLAIMS:

## I. INTRODUCTION.

Defendant, U.S. Department of the Air Force ("DoAF"), has unlawfully evaluated Plaintiff RKR Joint Venture LLC's ("RKR") bid in response to Solicitation F41689-02-R-0049, a contract for a Base Operating Support Cost Study (Little BOS)[1] at Keesler Air Force Base, MS. The acquisition is a small business set-aside and a negotiated procurement. RKR's timely bid was the only outside bid received. DoAF decided to award the contract to itself despite the fact that its own bid did not include the entire scope of work in the solicitation. If it had, DoAF's bid would have been significantly higher than RKR's.

On August 2, 2007, in a Government Accounting Office ("GAO") bid protest #B-299856 brought by RKR, which was ultimately denied within the past 48 hours, Defendant stated in writing that it was now inclined to cancel the solicitation because it does not meet their requirements, though upon information and belief it has not yet done so. Defendant's justifications for cancellation are pretextual, reference programs such as "AFNetOps" that have

[1] Little BOS includes Communications and Information Technology, Visual Information Management and Publishing Management.

little impact on the actual contract to be awarded, and do not comply with applicable Federal Acquisition Regulations ("FAR"),[2] *e.g.*, 48 C.F.R. 14 et seq (sealed bidding).

RKR was the lowest bidder on the solicitation that DoAF set out, and DoAF cannot award the contract to itself by changing the bidding and bid evaluation rules for itself only. Further, DoAF has not complied with the requirements to cancel the solicitation and cannot now do so because all alleged justifications for a "change" in how well the solicitation met DoAF's requirements between the time DoAF stated it would award the contract to itself at the end of the internal agency appeal on May 23, 2007, and the time they stated to the contrary in RKR's GAO protest roughly 70 days later on August 2, 2007, are blatantly pretextual and not compelling.

Immediate injunctive relief is necessary to (1) prevent DoAF from cancelling the solicitation and (2) prevent DoAF from awarding the contract to itself.

## II. NOTICE

Pre-filing notice has been provided per Part II of Appendix C of the Local Rules.

## III. STANDARD OF REVIEW

The four factors relevant to the decision to grant or deny a preliminary injunction are "(1) the likelihood of the [bidder's] success on the merits; (2) irreparable harm if the injunction is not granted; (3) the balance of hardships between the parties; and (4) the public interest." *Abbott Laboratories v. Andrx Pharmaceuticals, Inc.*, 473 F.3d 1196, 1200-1201 (Fed. Cir. 2007).

The basis for injunctive relief is irreparable injury and inadequacy of legal remedies. This requires a court to balance the competing claims of injury and the effect on each party of granting or withholding of the requested relief. Since the pending motion is for a preliminary

[2] To include any applicable Department of Defense Federal Acquisition Regulations ("DFAR"), 48 C.F.R. 200 et seq.

injunction rather than a permanent one, plaintiffs need only show a likelihood of success on the merits rather than actual success.

The profoundly different role of evidence in a preliminary injunction bears emphasis:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party is thus not required to prove his case in full at a preliminary injunction hearing . . . and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.

*University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted).

## IV. EXHIBITS

**Exhibit 1** Keesler AFB Administrative Appeal Response, May 23, 2007, Maj. Gen. John W. Maluda (stating that DoAF would award the contract to itself and that the function provided by the solicitation was still required)

**Exhibit 2** Declaration Statement submitted to GAO in protest #B-299856, Aug. 2, 2007, Maj. Gen. William T. Lord (stating that "Solicitation requirements no longer adequately reflect the Air Force needs, and any contract resulting from award under this solicitation will fail to meet the Air Force's requirements.")

**Exhibit 3** RKR Joint Venture, LLC bid protest to GAO

## V. A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED

The facts as stated in the Verified Complaint accompanying this application are incorporated herein as if fully stated.

### A. RKR has a substantial likelihood of success on the merits

1. Injunction to prevent DoAF from cancelling solicitation

**Exhibits 1** and **2** speak for themselves. Not 70 days after the DoAF awarded the contract for Solicitation F41689-02-R-0049 to itself, suddenly the solicitation no longer met DoAF requirements when a protest was filed at the GAO. The allegedly changed circumstances cited in

paragraph 2 of **Exhibit 2** are wholly pretextual and not compelling. The alleged AFNetOps changes cited by Maj. Gen. Lord may change portions of the *requirement* but they do not significantly change the *contract to be awarded* at all. The location of performance is largely irrelevant for this services contract.

"Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a *compelling* reason to reject *all* bids and cancel the invitation." 48 C.F.R. 14.401-1(a)(1) (2006) (emphasis added). DoAF offers no compelling reason. It has not rejected its own bid. RKR is likely to prevail on the merits of the second claim for relief in its complaint, that any cancellation of the solicitation is unlawful.

2. Injunction to prevent DoAF from awarding the contract to itself via its MEO

**Exhibit 3** sets forth how DoAF's bid would change if it had included the entire scope of work in the solicitation. DoAF's only response is to permit itself to apply different assumptions and requirements from those in the solicitation. RKR is likely to prevail on the merits of the first claim for relief in its complaint, that award of the contract to DoAF is unlawful because DoAF was not the low bidder.

**B. A substantial threat of irreparable harm to RKR exists if the relief is not granted**

1. Injunction to prevent DoAF from cancelling solicitation

As noted in ¶ 67 of the Original Verified Complaint, the bids of RKR and the MEO were opened and made public and, thus, RKR's prices are now known to all interested parties, which will make it impossible for it to participate fairly in any future solicitation related to the services under Solicitation RFP F41689-02-R-0049.

Therefore, the status quo must be maintained to prevent DoAF from further distorting the bid process for the work underlying this solicitation to the detriment of RKR. If DoAF is permitted to cancel the solicitation, it will be permitted to reorganize the deck chairs in myriad ways to make it appear as though, even if RKR were to prevail, there would no longer be any work for RKR to perform, when in reality DoAF will be performing all of the work in the original solicitation, at higher cost, under different bureaucratic layers, compartments, and acronyms. Moreover, if DoAF is permitted to piecemeal away the work in the interim, RKR is at a clear disadvantage to any other potential bidders on such re-solicitations because its bid price has been made public. RKR is the rightful recipient of the contract award for this solicitation and should be able to rely on the availability of a full contract if it prevails in this litigation..

Experienced judges and counsel[3] know the numerous ways government departments can and do piecemeal, fragment, re-solicit, and otherwise obfuscate work that was part of a cancelled solicitation to keep that work from being subject to a prior bid or any bid. It has been done illegally before, and there is no reason to deprive RKR of the relief it is entitled to by allowing it to happen here.

2. Injunction to prevent DoAF from awarding the contract to itself via its MEO

If DoAF awarded the contract to itself, performance might begin, thus diminishing the remaining relief available in the event the contract was ultimately awarded to RKR.

**C. Granting the injunctive relief now will prevent further harm to both parties**

1. Injunction to prevent DoAF from cancelling solicitation

"Cancellation . . . is disfavored after bid opening and is generally inappropriate when other bidders would not be prejudiced by an award under an ostensibly deficient solicitation and

---

[3] Counsel for RKR spent 12 years as an Air Force JAG Officer handling contracting matters prior to entering private practice.

when such an award would serve the actual needs of the government." *California Marine Cleaning, Inc. v. U.S.*, 42 Fed. Cl. 281, 293 (1998). The solicitation serves the actual needs of the government as demonstrated by DoAF's own bid and the conclusion in **Exhibit 1** that DoAF would award the contract to itself and that the function was still required. DoAF offers no compelling reason for cancellation.

Pretextual arguments aside, the function is still needed and DoAF and RKR both need not bear the burden of subsequent solicitation process(es) for what will still be the same work. Cancellation prejudices RKR relative to DoAF and any new bidders because RKR submitted the true lowest bid for this solicitation, but has not been awarded the contract.

Finally, the DoAF's cancellation decision cannot be justified as an effort to avoid litigation in this court. *California Marine Cleaning, Inc. v. U.S.*, 42 Fed. Cl. 281, 296 (1998) ("This justification fails to present a compelling reason for cancellation for two reasons. First, the agency's cancellation decision must be supported by evidence in the administrative record at the time of decision, not based upon post hoc rationalization. Second, the rationale stated by the Government, which presumably is based upon a desire to avoid protracted litigation of the dispute or to appease the plaintiff, simply cannot be considered "compelling." Failure to make a decision is not one of the listed criteria in FAR 14.404-1(c).")

2. Injunction to prevent DoAF from awarding the contract to itself via its MEO

The FARs permit DoAF to award the contract to itself after the solicitation is cancelled, but only if it is the lowest bidder, 48 C.F.R. 14.401-1(f) (2006), which it is in fact not when a legally adequate evaluation is made. DoAF will pay more than it should if it awards the contract to itself, and irretrievably commit resources it otherwise should not. Further, in its own words DoAF has stated in **Exhibit 2** that it is inclined to cancel the solicitation, so if the cancellation is

truly non-pretextual, DoAF will experience no harm maintaining the status quo and not awarding the contract.

**D. Grant of the TRO and Preliminary Injunction Will Be In the Public Interest**

Under the FAR and procurement statutes, the DoAF must make the award to the bidder that submitted the lowest responsive bid. See 41 U.S.C. § 253b(c) (1994); 48 C.F.R. §§ 14.301(a), 14.408-1(a). That has not occurred. Award to DoAF must be prevented to vindicate the public's interest in ensuring that public contracts are directed to the lowest bidders. Cancellation must be enjoined to prevent DoAF from obstructing and piecemealing away in the interim the relief due to RKR when its bid is held to be the lowest.

VI. CONCLUSION AND PRAYER FOR RELIEF

For all of these reasons, Defendant should be immediately enjoined from cancelling Solicitation F41689-02-R-0049 or awarding the contract under that solicitation to itself. This matter should be set for hearing under the local rules governing bid protest cases as soon as possible. Any bond requirement should be waived, or, in the alternative, set at $100 or less.

DATED August 23, 2007

Respectfully submitted,

David F. Barton, Attorney-in-Charge
State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 100
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

**VERIFICATION OF NOTICE AND DELIVERY**

Pursuant to 28 U.S.C. § 1746, I declare that:

"My name is David F. Barton. I am a resident of San Antonio, Bexar County, Texas. I am over the age of twenty-one (21) years, am competent to testify, and state that the following is of my own personal knowledge, true and correct."

"I am counsel for RKR Joint Venture, LLC in this case. The facts regarding notice stated in Part II of this application are true and correct. This application has been served on the DOJ by hand or fax as required by RCFC Appx C ¶ 10."

"I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

Executed on August 23, 2007.

DAVID F. BARTON

05-29-07 P12:44 IN

23 May 2007

MEMORANDUM FOR RKR JOINT VENTURE (RKR)

FROM: Keesler Administrative Appeal Process Authority
245 Davis Ave E, Ste 280
Barksdale AFB, LA 71110-2279

SUBJECT: Keesler Air Force Base Administrative Appeal Response

1. The Administrative Appeal Process Review Team reviewed RKR Joint Venture (RKR) appeal of the Keesler Little BOS cost comparison study. Below is the Air Force's position regarding your appeal:

a. Item #1: Incorrect Federal Income Tax Calculation.

Air Force response. RKR appeal item #1 was accepted as an appealable item but not substantiated.

Discussion. Upon review of the Federal Income Tax calculations it can be substantiated the Government did not use the tax code listed in the solicitation. When the latest industry codes and calculated tax rates were compiled on 1 August 2005, they were loaded into the cost comparison software program prior to the cost comparison. The previously published code selected by the contracting officer was no longer listed and the Government analyst selected the default code—"Misc. Not Elsewhere Classified."

The industry codes and calculated tax rates are published by the Internal Revenue Service. The A-76 study software (COMPARE) uses the published codes from the Internal Revenue Service in Table 14. This is a mandated table that is provided to the users of the software program and adding "user-defined" industry codes or uncontrolled rates to the table is not permissible. The tax table 14 is not all inclusive of every industry code in the North American Industrial Classification System. The tax rate calculations are based on statistical sound samples on Corporate Tax Filings and often consolidate like industries to produce the appropriate data.

There are situations that arise where the exact industry code does not appear on the list (Table 14). In this case, the Government followed the customary practice and complied with OMB Circular A-76 policy to find the closest industry code or use "Misc Services, not elsewhere classified" tax code. This tax code selection is a joint decision made by the contracting officer and manpower representative when the time costs are compared and reviewed by an independent auditor.

PLAINTIFF'S
EXHIBIT
1

As such, the government followed established procedures regarding selection of the Federal Income Tax. The procedures followed by the government provided a fair evaluation. Additionally, if the Federal Income Tax code in the solicitation were to be used, assuming it was inclusive of Table 14, the contractor bid would still be insufficient to overcome the $4,972,800 bid difference to overturn the initial in-house decision.

b. Item #2: The Most Efficient Organization (MEO) is not compliant with the Performance Requirements Document (PRD) in respect to the Network Operations SC1B work section.

Air Force response. RKR appeal item #2 was accepted as an appealable item but cannot be substantiated.

Discussion. RKR appeal alleges the MEO did not properly staff Network Operations. It further states the MEO improperly applied a Network Operations Security Center (NOSC) Centric method as its staffing strategy. Our examination revealed there were areas in the PRD and the MEO Management Plan which mentioned Network Control Center (NCC) Reengineering or NOSC-centric within the documents. The PRD referenced NCC reengineering offered insight to future Air Force plans that may be of interest to the selected service provider. In fact the MEO Management Plan does reference "touch maintenance," however, does not refer to how the MEO will staff the Network Operations.

Exhibits in the RKR appeal reference several instances where they allege as examples of MEO utilizing NOSC-centric methodology. However, the lead paragraph of both sections mentions Network Operations have been adequately staffed to respond to both surge and day-to-day requirements on a 24/7 basis if necessary.

Additionally, the Management Plan goes on to explain, "...the PRD identified the following initiatives that could impact workload; however, the impact could not be quantified:

- AETC is currently reengineering the base Network Control Centers (NCC) command-wide. The goal of the AETC NCC Reengineering initiative is to implement a NOSC centric enterprise network within AETC. The NOSC centric network will standardize and streamline network operations throughout the command. AETC NOSC has the authority to direct standardized network configurations, restoration of network services, patching of security vulnerabilities, and coordinate the response to network outages or intrusion attempts."

This statement demonstrates the MEO is aware of potential changes to current operations, but those changes or NOSC-centric operations were not quantified in the Management Plan. Thus the MEO staffing is based upon the PRD requirements.

c. Item #3: The MEO used the incorrect grade levels for staffing the Quality Assurance Evaluator (QAE) function for the MEO subcontracts.

Air Force response. RKR appeal item #3 was accepted as an appealable item but was not substantiated.

Discussion. Chapter 3 of the MEO Management Plan section 3.2.1.7. states:

"Project Support (SC1) will be staffed with 12 personnel as set forth in Attachment 6, MEO Personnel Analysis. Staffing was based, in part, on the Operational Audit (OA) and Standard Indirect Allowance Model as discussed under paragraphs 3.1.2 and 3.1.4. The OA recommended a staffing of SC1 at 10.394 (fractional manpower) which was rounded down to 10. Project Support was staffed with two Quality Assurance Evaluators (QAEs) for the Multimedia subcontract, consistent with current operations."

The actual positions included in the cost comparison found that SC1 was staffed with 12 positions. Two additional positions with the grade structure of GS-12 and GS-11 representing the QAE requirements were included under "Keesler AFB MS" as positions 6001 and 6002. The backup personnel cost spreadsheet that cross-walks to the data entries for the cost comparison (personnel Line 1) referenced the 6001 and 6002 positions as the QAE positions. Therefore, the grade structure for staffing the QAE function for the MEO subcontracts is consistent with A-76 policy.

d. Item #4: The MEO failed to provide the manpower to perform the duties of producing the reports required by the PRD listed in Appendices 7.c and 8.c and to adequately perform Quality Control Management functions.

Air Force response. RKR appeal item #4 was accepted as an appealable item but was not substantiated.

Discussion. Appellant alleges two errors committed by the MEO: a) the SC1 requirement should be rounded up to 10.4 and, b) the manpower provided is inadequate to perform quality control functions.

a. Mapping the MEO Management Plan to the actual entries on Line 1 of the MEO cost estimate is sometimes challenging. However, analysis of the cost comparison data found 12 positions to include the MEO Manager assigned to SC1 when the operational audit calculated 10.394 required. Additionally, scheduled overtime hours were included as other pay for three GS-09 positions. Therefore, the 10.394 staffing requirement was increased to 11 positions, the MEO manager position was added to increase the SC1 staffing total to 12 positions, and an additional allowance factor at management's discretion was included as scheduled overtime thereby exceeding the operational audit minimum staffing calculations for SC1. As a result, the submitted allegation is not supportable when the actual staffing included in the cost comparison is examined.

b. The second issue is whether the Quality Control (QC) Plan is effective at performing the requirements in the PRD. A side issue is whether the MEO planned on utilizing subcontract QAEs to perform the internal QC work for the entire MEO. According to the MEO Quality Control Plan, "the MEO Chief has executive responsibility for the development and maintenance of the quality system, overseeing the day-to-day operations for the quality system, and interacting directly with the government on quality and performance management issues. Primary responsibility for implementing the quality system resides with the functional area supervisors. The supervisors ensure that documented procedures define the specific responsibilities, authorities, and relationships of personnel who manage, perform,

or verify work that affects quality." The QC Plan provides that QAEs will monitor subcontractor performance. Additionally, our examination of documents did not provide evidence the QAEs were being used for other than QAE purpose. In summary, the PRD does not require a separate QC organization and the QC Plan provided by the MEO is sufficient.

e. Item #5: The MEO training dollars allocated are not consistent with requirements of the PRD or reality. Correction of this issue will adjust the MEO IHCE in this area to reflect an increase of approximately $398,960.

Air Force response. RKR appeal item #5 was accepted as an appealable item but cannot be substantiated.

Discussion. Contrary to appellant's assertion, the MEO training dollars are consistent with the requirements of the PRD. The proposed MEO will be made up of all civilian, fully-qualified, incumbent workforce at the start of the service. Obviously, these employees would not require the same amount of training as a completely new workforce. The resultant training cost estimate may seem low to a private sector provider; however, the methodology used to determine the training cost is sound and rational.

2. In summary, the Administrative Appeal Process Team finds the competition was conducted fairly and concurs with the decision to select the MEO (in-house) as the selected service provider for the Keesler AFB Little BOS function. The determinations set forth herein constitute a final Administrative Appeal Process decision.

JOHN W. MALUDA, Major General, USAF
Keesler Administrative Appeal Process Authority

**DEPARTMENT OF THE AIR FORCE**
**OFFICE OF THE CHIEF OF STAFF**
**WASHINGTON, DC**

MEMORANDUM FOR AF/A1M

FROM: SAF/XCT

SUBJECT: Declaration Statement - AF Network Operations (AFNetOps)

1. The Air Force has embarked on a major transformational initiative to completely overhaul and change the delivery of network services from a base, post, camp, station/major command (MAJCOM) centric concept of operations to centralized or enterprise-centric concept of operations (AFNetOps CONOPS). The initiative is entitled AFNetOps Transformation and impacts the following Air Force components: doctrine, organization, training, materiel solutions (i.e., technology), logistics, personnel, and facilities within the communications and information mission area. The organizational spectrum of impact includes, but is not limited to, Communications Squadron (Information Systems Flight), MAJCOM Network Operations and Security Centers (NOSC), MAJCOM/A6s (Communications and Information Directorate), Air Force Communications Agency, Air Force Network Operations Center (8th Air Force--AFNETOPS).

2. The AFNetOps implementation plan will address the migration of core enterprise services which include, but are not limited to messaging, web, storage, and help desk from the base communications squadrons to regional area processing centers. For Keesler AFB, the functions mentioned above will no longer be performed at the base, and it is anticipated that AFNetOps has changed 57 percent of the requirement as set forth in the current Little BOS Solicitation. The current Little BOS Solicitation requirements no longer accurately reflect the Air Force needs, and any contract resulting from award under this solicitation will fail to meet the Air Force's requirements.

3. For any questions, please contact Lt Col Helen Lento, SAF/XCTX, 703.588.2776.

//signed-wtl//

WILLIAM T. LORD, Maj Gen, USAF
Director, Cyberspace Transformation and Strategy
Office of Warfighting Integration and
Chief Information Officer

PLAINTIFF'S EXHIBIT 2

# AIR FORCE COMMERCIAL LITIGATION DIVISION

HQ AFLOA/JACQ
1501 WILSON BOULEVARD
ROOM 600
ARLINGTON, VIRGINIA 22209-2403

TELEPHONE: (703) 696-9079 DSN: 426-9078
FAX: (703) 696-9084 DSN: 426-9084

DATE: 2 August 2007

FROM: Gary R. Allen, gary.allen@pentagon.af.mil

SUBJECT: RKR Joint Venture, LLC, B-299856, Response to Request for Additional Information and Additional Notice of Corrective Action and Request for Dismissal

TO:

| Name | Firm/Agency | Phone | Fax |
|---|---|---|---|
| Glenn G. Wolcott, Esquire | GAO Procurement Law Group | 202-512 9710 | 202-512-9749 |
| David F. Barton, Esq. | The Gardner Law Firm | 210-733-8191 | 210 733-5538 |

TOTAL PAGES INCLUDING COVER: 7

REMARKS:

The information contained in this facsimile may be privileged attorney/client communication or attorney work product and may be further protected under the privacy act. It is not subject to discovery or release under the freedom of information act. It is confidential and intended for the exclusive use of the individual named above. Any distribution of this document to anyone other than the addressee without the express approval of the sender is specifically prohibited and may result in civil or criminal liability. If you have received this document in error, please notify this office immediately by telephone and return the document by U. S. Mail.

This Transmission contains NO Protected Material

The Gardner Law Firm
A Professional Corporation

David F. Barton
Wm. Richard Davis (Retired)
Jay K. Farwell
Dawn B. Finlayson
Gregory M. Huber
R. Wes Johnson†
Mary Q. Kelly
William W. Sommers
J.P. Vogel
Thomas J. Walthall, Jr.
*†Board Certified-Consumer & Commercial Law*
*Texas Board of Legal Specialization*

June 7, 2007

General Counsel
Government Accountability Office
441 G Street, NW
Washington, D.C. 20548

***VIA FACSIMILE (202) 512-9749***

**Attn: Procurement Law Control Group**

RE: GAO PROTEST
RKR Joint Venture, LLC
10401 Boney Avenue, STE.B
D'Iberville, MS 39540
Kenneth R. Lee
Email: kenlee@kmar.com
Voice: (228) 392-4968
FAX: (228) 392-5079

Subject: Solicitation F41689-02-R-0049
Department of the Air Force
Air Education and Training Command
Specialized Contracting Squadron
2021 First Street West
Randolph AFB, TX, 78150-4302

Dear Counselor:

Comes now before you David F. Barton, Esq, The Gardner Law Firm, on behalf of RKR Joint Venture, LLC and hereby protests subject solicitation, which is for a Cost Plus Award Fee/Award Term then converting (through negotiations) to Fixed Price Award Fee (FPAF)/Award Term during option year 3 contract for Keesler AFB BOS Cost Study (Little BOS) at Keesler Air Force Base. The acquisition is a small business set-aside and a negotiated procurement.

745 East Mulberry Avenue • Suite 100 • San Antonio, Texas • 78212-3167
Telephone: (210) 733-8191 • Telecopier: (210) 733-5538 • E-Mail Address: gardner@tglf.com

PLAINTIFF'S EXHIBIT 3

**Basis for the Protest:** This protest is based upon the fact the agency failed to consider all of the costs that will be required for in-house performance of the competed requirements. That failure is exhibited as follows:

(1) The Federal Income Tax calculations show the Government did not use the tax code listed in the solicitation. Correction of this issue will adjust the Most Efficient Organization (MEO) In House Cost Estimate (IHCE) by an increase of $1,518,896.

(2) The MEO is not compliant with the Performance Requirements Document (PRD) to meet the solicitation requirements of the Network Operations SC1B work section. Correction of this issue will adjust the MEO IHCE by an increase of $17,606,437.

(3) The MEO used the incorrect grade levels for staffing the Quality Assurance Evaluator (QAE) function for the MEO subcontracts. Correction of this issue will adjust the MEO IHCE by an increase of $431,443.

(4) The MEO failed to provide the manpower to perform the duties of producing the reports required by the PRD listed in Appendices 7.c and 8.c and to adequately perform Quality Control Management functions. Correction of this issue will adjust the MEO IHCE by an increase of $1,556,899.

(5) The MEO training dollars allocated are not consistent with requirements of the PRD or reality. Correction of this issue will adjust the MEO IHCE by an increase of $398,960.

Adding the foregoing costs to the MEO IHCE increases it $21,512,635.00 for a total of $72,963,321. RKR's adjusted bid was $58,173,071. The agency defended against RKR's agency appeal, **Attachment V-F**, which is referenced later herein, generally arguing that the MEO was fully compliant with all PRD requirements. If the protest is granted, the MEO should not be allowed to revise its price proposal and RKR should be awarded the challenged contract. See BAE Systems Technical Services, Inc., B-293070, January 28 2004, at 9. Considering the unreasonableness of the challenged bid criteria and the Agency Appeal Authority response to RKR, the "multiple failures [are] damaging [to] the integrity of the A-76 process, and allowing revisions to the MEO now would only compound the damage." Id., at 10. "The A-76 process requires that the MEO's IHCE reflect all costs associated with performance of [PRD] requirements." Id., at 12. The MEO's IHCE was so deficient in this case that it should not have been certified and the government's decision to accept it was unreasonable.

e. **Interested party:** RKR certifies that it is an interested party by virtue of the following:

-- RKR is a prospective offeror and was represented at the pre-proposal conference and site visit conducted on 20-21 May 2003 for this procurement.
-- RKR did submit questions in response to the solicitation and site visit.
-- RKR has maintained contact with the contracting agency throughout the procurement process.
-- RKR is a small business concern for the purpose of this solicitation.
-- RKR did submit a proposal.
-- RKR has timely filed this protest within 10 days of debriefing.
-- RKR received award of the contract except for the prejudice suffered.
-- RKR did file an appeal through the administrative appeal process headed by John W. Maluda, Major General, USAF, Keesler Administrative Appeal Process Authority, 245 Davis Ave E., Ste 200, Barksdale AFB, LA 71110-2279

f. **Request for GAO ruling:** RKR requests that the Comptroller General (GAO) rule in its favor and provide relief as requested below.

g. **Request for documents:** A request for documents pursuant to 4 CFR 21.3 is enclosed.

h. **Request for Hearing:** RKR requests a hearing, interrogatories, and oral depositions. These are necessary because any violations of required procedures, law, and regulations cannot be adequately discovered from agency documents, but must be discovered from questioning individual evaluators, technical advisors, and other source selection personnel.

**FACTS**

1. Congressional Notification/Public Announcement was made 21 Sep 1999.
2. Sources Sought Synopsis #2/Pre-Solicitation Notice, Keesler PAB Cost Study was posted to FBO on 25 Jan 2002.
3. First Notice to Offerors for Solicitation Number: F41689-02-R-0049 was posted to FBO on 16 Aug 2002.
4. An industry day for the Pick-a-Base Program, and specifically the Keesler BOS Cost Study was scheduled for 25 Sep 2002, at the Randolph Base Theater on 06 Sep 2002 and subsequently postponed on 11 Sep 2002.
5. Solicitations 01-07 were posted to FBO 08-11 Sep 2002.

6. Draft RFP F41689-02-R-0049 Keesler PAB (Little BOS) Cost Study 01-14 was posted to FBO on 03 Feb 2003. Draft RFP F41689-02-R-0049 Keesler PAB (Little BOS) Cost Study 15 was post on 10 Feb 2003. Draft RFP F41689-02-R-0049 Keesler PAB (Little BOS) Cost Study 16 was posted on 14 Feb 2003.
7. The pre-proposal conference for F41689-02-R-00 49 was held at the Keesler Club (located on Larcher Blvd) Keesler AFB, MS on 23 and 24 June 2003 and was attended by six members of the of RKR Joint Venture. Among those present for RKR were Kenneth R. Lee, President, and Ed Williams, Vice President.
8. The due date for submission of the Mission Capability/Proposal Risk (Volume II), Small Business Subcontracting (Volume III), Cost (Volume IV), and Contract Documentation (Volume V) was postponed indefinitely by Amendment 12 dated 16 Apr 2004
9. Proposal due date for submission was re-established to 13 Aug 2004 per Amendment 14 dated 08 Jul 2004.
10. A new cost model for Keesler Little BOS incorporating Mobilization and Transition was posted to FBO 21 Jul 2004.
11. The due date for submission of the Mission Capability/Proposal Risk (Volume II), Cost (Volume IV), and Contract Documentation (Volume V) was extended from 13 AUG 04, 4:30 p.m. local time to 20 AUG 04, 4:30 p.m. local time per Amendment 16 dated 10 Aug 2004.
12. RKR Joint Venture, LLC submitted a proposal in accordance with Amendment 16 on 20 Jun 2004.
13. Past Performance ENs were received by RKR on 31 Mar 2005.
14. Notice and Results of the OMB A-76 Cost Comparison Study, RFP F41689-02-R-0049, Base Operating Support Services at Keesler AFB, MS, informing RKR that the results favored the MEO, but indicating that RKR Joint Venture, LLC, 10401 Boney Ave Ste B, D'Iberville, MS 39540 was the selected offeror, was received on 18 Aug 2005.
15. Notice to offerors posted 08 Sep 2005 postponed the cost study due to hurricane Katrina.
16. Notice to offerors posted 19 Jan 2007 resumed subject cost studies.
17. RKR Joint Venture received its final debriefing 07 Feb 2007.
18. RKR filed an appeal through the administrative appeal process headed by John W. Maluda, Major General, USAF, Keesler Administrative Appeal Process Authority, 245 Davis Ave F., Ste 200, Barksdale AFB, LA 71110-2279 on 30 Mar 2007.
19. RKR received it's Keesler Air Force Base Administrative response denial notification via certified mail on 29 May 2007.
20. RKR initiated it's GAO protest process on 29 May 2007

Additional facts will be discussed in relation to the argument of the errors.

## ARGUMENT

### I. INCORRECT FEDERAL INCOME TAX CALCULATION

Offerors were informed in a pre-proposal conference/site visit of 23 June 2003 that "Keesler will be last A-76 in AETC under old circular." Briefing slides are attached as **Attachment I-A.** All offerors were informed in the solicitation process that the revisions of 29 May 2003 to the Revised Supplemental Handbook (RSH) did not apply to this procurement because the competition was initiated before the effective date of its publication in the Federal Register. This position was stressed by the Air Force throughout the procurement process and was reiterated during the debriefing given to RKR.

The foregoing policy, as it is argued in this citation of error, is reflected in the solicitation at section L, paragraph g, page L-9 that states (**Attachment I-B** RFP F41689-02-R-0049):

> g. North American Industry Classification System (NAICS)
> The contracting officer has established NAICS 541513 for the basic contract. The Industry tax revenue code number to be used on the COMPARE form is 50-31-4825.

The Government did not follow the foregoing guidance and did not use the correct tax rate associated with NAICS 541513 Industry tax revenue code 50-31-4825 as specified the RFP. Instead, the Government used a rate of .0026 or 0.26% for the calculation of Line 12 of the CCF form. The correct rate for Industry tax revenue code 50-31-4825 is 0.031 or 3.1%. Since the rate to be used is specified in the PRD, then, the Government must use that rate. The cost impact of the rate correction on line 12 of the CCF form is shown in RKR Exhibit IA.

**Exhibit IA: Income Tax Credit**

| Period | Total Evaluated Contract Price | Current Rate used by MEO | Current Income tax Credit in CCF | Tax Rate Listed in RFP Section L Paragraph G (Note 1) | Corrected Income Tax Credit |
|---|---|---|---|---|---|
| 1 | $1,213,363 | (0.26%) | ($3,155) | (3.10%) | ($37,614) |
| 2 | 5,162,125 | (0.26%) | (13,422) | (3.10%) | (160,026) |
| 3 | 5,206,104 | (0.26%) | (13,536) | (3.10%) | (161,389) |
| 4 | 5,206,883 | (0.26%) | (13,538) | (3.10%) | (161,413) |
| 5 | 5,201,772 | (0.26%) | (13,525) | (3.10%) | (161,255) |
| 6 | 5,215,333 | (0.26%) | (13,560) | (3.10%) | (161,675) |

| | | | | | |
|---|---|---|---|---|---|
| 7 | 5,209,190 | (0.26%) | (13,544) | (3.10%) | (161,485) |
| 8 | 5,248,688 | (0.26%) | (13,647) | (3.10%) | (162,709) |
| 9 | 5,256,849 | (0.26%) | (13,668) | (3.10%) | (162,962) |
| 10 | 5,273,354 | (0.26%) | (13,711) | (3.10%) | (163,474) |
| 11 | 5,288,683 | (0.26%) | (13,751) | (3.10%) | (163,949) |
| | | | | | |
| **Totals** | **$53,482,344** | | **($139,057)** | (3.10%) | **(1,657,953)** |
| | | | | | |
| **Change in Tax Credit** | | | | | **($1,518,896)** |
| | | | | | |
| Note 1: Rate from Compare Table 14 for Tax Code 50-31-4825 is 3.1% | | | | | |

**THE AGENCY APPEAL RESPONSE:**

The Air Force Appeal Response (**Attachment I-C**, page 1) found that RKR's argument in its agency appeal was accepted as an appealable item but was not substantiated. The agency appeal response was:

> **Discussion:** Upon review of the Federal Income Tax calculations it can be substantiated the Government did not use the tax code listed in the solicitation. When the latest industry codes and calculated tax rates were compiled on 1 August 2005, they were loaded into the cost comparison software program prior to the cost comparison. The previously published code selected by the contracting officer was no longer listed and the Government analyst selected the default code---"Misc. Not Elsewhere Classified."
>
> The industry codes and calculated tax rates are published by the Internal Revenue Service. The A-76 study software (COMPARE) uses the published codes from the Internal Revenue Service in Table 14. This is a mandated table that is provided to the users of the software program and adding "user-defined" industry codes or uncontrolled rates to the table is not permissible. The tax table 14 is not all inclusive of every industry code in the North American Industrial Classification System. The tax rate calculations are based on statistical sound samples on Corporate tax Filings and often consolidate like industries to produce the appropriate data.
>
> There are situations that arise where the exact industry code does not appear on the list (Table 14). In this case, the Government followed the customary practice and complied with OMB Circular A-76 policy to

> find the closest industry code or use "Misc Services, not elsewhere classified" tax code. This tax code selection is a joint decision made by the contracting officer and manpower representative when the time costs are compared and reviewed by an independent auditor.
>
> As such, the government followed **established procedures** regarding selection of the Federal Income Tax. The procedures followed by the government provided a **fair evaluation**. Additionally, if the Federal Income Tax code in the solicitation were to be used, assuming it was inclusive of Table 14, the contractor bid would still be insufficient to overcome the $4,972,800 bid difference to overturn the initial in-house decision. (Emphasis added).

The agency appeal response was not a "fair evaluation" as they allege or it would have employed the tax table that was referred to in the solicitation and referenced by the agency in its debriefing to RKR. The agency did not follow the "established procedure" of the solicitation because the procedures established for this solicitation were those addressed in the solicitation and the debriefing to RKR that RKR argues should have been used and were not. The action by the agency was unreasonable, arbitrary and capricious.

The Agency Appeal response was based upon the RSH of 29 May 2003 and not the "old" RSH, as was referenced in the solicitation. The RSH under which this A-76 study was conducted, that is, OMB Circular No. A-76 (Revised 1999) and as updated through Transmittal Memorandum 25 dated 14 March 2003 does not specifically require the use of the COMPARE program and it established the procedures for application of the tax rate. Part II, Chapter 3, paragraph G.2 states at **Attachment I-D**:

> 2. To simplify the tax computation, Appendix 4, prepared by the Internal Revenue Service, provides, by types of industry, appropriate tax rates in relation to business receipts. The industry groupings conform to the Enterprise Standard Industrial Classification issued by the Department of Commerce. To determine the amount of estimated Federal income tax, the contract price (Line 7 of the GCCF) for each performance period will be multiplied by the applicable tax rate. The estimated amount of Federal income tax will be entered on Line 12 as a deduction, i.e. negative, reducing the cost of contracting.

The tax table listed in Appendix 4 shows the tax rate at 3.1%. All subsequent updates to the tax tables in Appendix 4 on the OMB website showed the correct tax rate. The latest revision to the tax tables is dated 16 June 06 and it too shows the correct industry code and tax rate. This tax table may be accessed on the OMB website at:

http://www.whitehouse.gov/omb/circulars/a076/a076sa4.html
The date the table was posted to the OMB website may be seen at:

http://www.whitehouse.gov/omb/query.html?col=omb&qt=tax+tables

The 29 May 2003 update to the RSH required the use of the COMPARE program. The "old" RSH, which applied to this solicitation, did not. Therefore the inclusion of the revised tax tables of 1 August 2005 was not "mandatory" nor was it a statutory requirement, it failed to follow the procedure established in the solicitation, and, as such, was wrong, unfair and unreasonable.

The agency's use of the revised tax table for the purpose of manipulating the MEO price was not reasonable. The tax table update of 1 August 2005 was not applicable to the "old" RSH. The notice in the Federal Registry of 1 August 2005 (**Attachment I-E**) states that the updated table is for the RSH of May 2003, which does not govern this procurement.

Additionally, even the RSH of 29 May 2003, Attachment C, paragraph C.6, page C-24 requires use of the tax table that RKR propounds and not that used by the agency. See **Attachment I-F**:

> An agency shall use the Tax Rate Table on the ***OMB website*** to calculate Line 12 for each performance period stated in the solicitation. (Emphasis added)

That table, as currently posted does show the correct industry code and correct tax rate. Additionally, it is of interest to note that the "official" tax table of 16 June 2006 on the OMB website does not agree with the latest COMPARE tax table update. When Industry codes exist, it is only reasonable that they be applied, which was not done here. To do otherwise, as the agency did, would be arbitrary and capricious and unreasonable.

The agency's statement "The previously published code selected by the contracting officer was no longer listed..." is correct only inasmuch as the COMPARE program version 1.6 was updated with a revised tax table that should not have applied to the "old" RSH and subsequent cost comparison. The then current OMB website tax table, as well as the current OMB tax table does show the correct industry code and the correct tax rate of 3.1%. The "official" tax table of 16 June 2006 on the OMB website does not agree with the latest COMPARE tax table update. In addition, the notice in the Federal Register of 1 August 2005 (**Attachment I-E**), which implemented the new tax tables, specified that:

> "DATES: Effective date: These changes are effective immediately and **shall apply to all public–private competitions performed in accordance with OMB Circular A-76 as revised in May 2003"** (emphasis added)

This means that the rate update of 1 August 2005, which was adopted in the Agency Appeal response, did not apply to this competition. It also stated that the updated tax tables were for COMPARE version 2.1, not version 1.6. The updating of the tax tables, only a few days before the cost comparison was improper and can be easily corrected by using the tax table that was current at the time of solicitation closing date.

The DOD A-76 Costing Manual 4100.XX-M dated 14 March 2001 also governed this solicitation. This Manual does require all DOD components to utilize "winCOMPARE" software. Yet the Manual at C7.2.1, page 74 **(Attachment I-G)** also requires that the Industry Tax Code to be used is from Appendix AP9 **(Attachment I-H)** of the manual.

> C7.2.1. The Industry Tax code is selected from the Tax Table at Appendix 9. It is recommended that this selection be a joint decision made by functional managers, representatives from contracting, and the budget office. The contracting officer input is desirable so that the Industry Tax Code chosen is consistent with the North American Industrial Classification System [previously called the Standard Industrial Classification (SIC)].

Appendix 9 also lists the correct tax rate of 3.1% for code 50-31-4825. The DOD A-76 Costing Manual 4100.XX-M dated 14 March 2001 does not require the update of the tax tables. Paragraph C18.3.3, page 98, **(Attachment I-I)** details when revisions to the In-house and contractor offers may be adjusted.

> C18.3.3. For negotiated procurements only,
>
> C18.3.3.1. In-house and contractor/ISSA offers shall be adjusted when the following events occur after private sector proposals have been received but before a tentative cost comparison decision is made:
>
> C18.3.3.1.1. OPM directs official in-house salary/wage rate adjustments (includes GS and WG pay), and/or
>
> C18.3.3.1.2. DoL directs contract wage rate adjustments in accordance with the SCA, and/or

C18.3.3.1.3. OMB directs inflation rate changes.

No reference is made to updating the tax tables in Appendix 9 of the DOD A-76 Costing Manual. In fact, Appendix AP5 - Important Factors and Rates (pages 118-119) **(Attachment I-J)** does not list tax rate updates as an "Important Factor and Rate" that requires updates at all. The Tax Table in Appendix 9 of the DOD Costing Manual exactly matches the Tax Rate Table of Appendix 4 of the RSH and they both match the current Tax Rate Table on the OMB website which was last updated on 16 June 2006. It is clear that the update of the Tax Rate on the agency's Cost Comparison Form was not proper for a procurement conducted under the "old" RSH.

The update to the Tax Rate Table on the Cost Comparison Form was made more than 13 months after the closing date of the procurement. Proposals were submitted on 20 June 2004. The table update was made 1 August 2005 and the tentative decision was announced on 18 August 2005. However innocent, this gives the appearance that the tentative decision was postponed until just a few days after a table update was made which substantially improved the MEO's position in the competition.

The support information provided on the COMPARE website **(Attachment I-K)** supports the fact that not all changes made to the rate tables are required to be made after receipt of offers. In response to the question "What is the policy for updating the Agency Cost Estimate (ACE) when COMPARE software or table updates are released?" The last paragraph of the response states:

> One other item to keep in mind is that once the offers have been submitted (solicitation closing date), you do not need to continually revise the offer (ACE) when rate and factor changes occur. What matters is that when the decision is made that it is based on the rates and factors that are current at the time. This is a contracting logistics issue with the solicitation and modifications to allow such changes that should be addressed by your contracting office.
>
> (see,http://www.comparea76.com/Support.asp?L=FAQ&L2=SFAQ&conBP=1&Q=1613)

No modifications to the solicitation were issued which changed the tax rate selected by the contracting officer. Had there been such a modification, RKR may have made a different business decision as to tender a bid or to protest the solicitation before the closing date. The prejudice suffered is self evident and seemingly easily corrected had the agency properly evaluated RKR's appeal.

In summary, Appendix 4 of the "old" RSH shows that, "[t]hese tax rates will be updated periodically." Yet no reference is made in the RSH that the tax rates will be updated in any manner other than through a Transmittal Memorandum of changes to the RSH. No such Memorandum was issued through Transmittal Memorandum 25, which was the last Transmittal Memorandum prior to the issuance of the Revised Circular of May 2003. The DOD A-76 Costing Manual 4100.XX-M of 14 March 2001 did not consider that the tax rate in Appendix 9 would be subject to change or that it would be an "important factor" that would be updated through a Transmittal Memorandum from the OMB. The DOD A-76 Costing manual makes no mention of the tax rate in Appendix 5 and the instructions contained in the manual indicate that the tax rate is to be computed from Appendix 9 of the Manual. Appendix 9 of the manual matched exactly the tax rate in Appendix 4 of the RSH. The revision made to the tax table on the OMB website of 16 June 2006 did not change any rate in either appendix. No conflict existed prior to 1 August 2005 when COMPARE version 2.1 was released and the tax rate tables were updated, yet, the Federal Register notice was clear that the changes were intended only for those competitions subject to the Revised Circular of May 2003, which did not govern this procurement.

The agency's statement that "adding "user-defined" industry codes or uncontrolled rates to the table is not permissible" is a response without justification. The agency's statement that "the contractor bid would still be insufficient to overcome the $4,972,800 bid difference to overturn the initial in-house decision" is correct but the $1,518,896, is substantial in and of itself and when applied to other corrections in the MEO's IHCE the difference requires award to RKR.

**<u>II. THE MOST EFFICIENT ORGANIZATION (MEO) IS NOT COMPLIANT WITH THE PERFORMANCE REQUIREMENTS DOCUMENT (PRD) IN RESPECT TO THE NETWORK OPERATIONS SC1B WORK SECTION AND SHOULD NOT HAVE BEEN CERTIFIED.</u>**

The MEO staffing for the Little Base Operating Services (BOS) does not meet the requirements as set forth in sections L, M and 7.1 in the final Performance Requirements Document (PRD). The MEO result is an unrealistically low staffing level based upon a flawed Operational Audit within the Network Operations (SC1B) work center. The MEO's Management Plan improperly applied a consolidated Network Operations Security Center method or "NOSC Centric" method of staffing. This methodology for staffing was expressly prohibited by the PRD and, most importantly, resulted in a monumental understatement of the cost of this work effort.

A NOSC is a Major Command-Level operations center one step higher in the Defense Information Systems Agency's hierarchy or "chain of command" than that of the base-level Network Control Centers (NCC) and forms the basis for the NCC Reengineering initiative in the Air Education and Training Command. The NOSC

method of operation is that bases get their direction from the NOSCs on day-to-day network activities. The AETC NOSC is located at Randolph Air Force Base. A NOSC-Centric approach is a term used in describing the goals of the Air Force-wide NCC Reengineering initiative. By centralizing duties that can be performed remotely, the Air Force's intention is to reduce the staffs and associated personnel costs. When the original version of the PRD was released in 2002, the document incorporated the NOSC Centric idea. When a revised version of the PRD was released in 2003, those NOSC Centric requirements were deleted and it is this 2003 version of the PRD upon which this solicitation was based. (Please note: The term NOSC has just recently begun to be replaced by the term "Major Command Communications Coordination Center" (MCCC)).

Due to the deletion of NOSC Centric requirements, in June 2003, a question was submitted to AETC CONS/LGCK regarding the NOSC reengineering effort. The question **# T-07-046** and corresponding response by the contracting office are found in a spreadsheet dated 25 Sep 2003 from AETC CONS/LGCK (**Attachment II-A**). The text of the question and the government's response are as follows:

**Question # T-07-046**

> "Previous versions of the PRD mentioned "NOSC centric" management, monitoring, configuring, and troubleshooting of all core services (DNS, DHCP, file, web, applications, e-mail, and firewall servers). Section 7-1 removes all references to the NOSC centric method of enterprise network administration and further indicates that the service provider installs operates, and maintains network infrastructure that provides internal and external connectivity of Keesler AFB, ensuring interoperability with other Air Force Systems. However, Section 7.4, paragraph 7.4.1.1 indicates AETC is presently reengineering the BNCC command wide with a goal of NOSC-centric enterprise network. It seems strange that the NOSC-centric concept was a major part of section 7-1 previously and now it is conspicuously absent. Please clarify the current status of this initiative and provide information about estimated completions of this initiative. Will it be in place at CSD? Is the service provider expected to staff and describe their methodology to perform the work in a NOSC-centric environment or a non-NOSC-centric environment?"

**Response by Contracting Officer**

> "All references to the NOSC-centric initiative were removed from section 7-1, due to funding and manning issues that have *halted its implementation*. The reference to the NOSC-centric initiative was retained in section 7.4 (General Information) because this program is still *a long-range goal*. The status of the NOSC-centric initiative and timelines will be updated in section 7-4 as they become available. *Section 7.1 contains the requirements that the service provider must meet and section 7-4 simply offers an insight to the Air Force's future plans* that may be of interest to the Service Provider." *(Emphasis added)*

This question and subsequent answer clearly show that, when developing the proposal, core services such as DNS, DHCP, file, web, application, e-mail, and firewall servers and routers are to be administered, managed, and maintained by personnel physically located at the NCC, not the NOSC. The NOSC Centric method of operation is not included in the challenged solicitation and was not a bidding factor. The MEO, which employed the NOSC Centric method of operation in its proposal is, therefore, clearly not compliant with the PRD. The MEO's whole approach for staffing this section was incorrectly based upon utilizing a NOSC-Centric approach by bidding "touch labor" only and does not staff the NCC adequately for a non-NOSC Centric method of operation.

**RKR Exhibit II-A1 and Exhibit II-A2**:

These charts show how Core services requirements were initially defined in the PRD, how they were revised by the Contracting Office answer to question # T-07-046, and how the MEO bid the initial PRD NOCC Centric method of operation requirements and not the actual revised non-NOSC Centric requirements. The last column of Exhibit II–A2 shows the erroneous application of the MEO's NOSC Centric plan and the severe shortfall in manning the NCC with only ten personnel.[1]

In contrast to the Government's manpower study showing 64 personnel were staffed to support the Keesler NCC Core Network Services, the MEO provided only 6 personnel to accomplish the exact same duties formerly performed by those 64 Government employees. The MEOs irresponsible staffing of only 6 personnel to

---

[1] The AETC NOSC is now implemented at Keesler. This happening of is of no consequence to RKR's protest because the issue in the protest as it relates to the NOSC is primarily one of a level playing field in which all bids deal with the same workload requirements, which was not done here. Interestingly, the Keesler NOSC is staffed with fifty personnel, vice the ten the MEO proposed. Further, at Columbus Air Force Base, a base approximately 1/3 the size of Keesler, the NOSC method of operation is in place and is staffed by 17 personnel.

The Gardner Law Firm
A Professional Corporation

accomplish ALL of the NCC Core Services is exactly characteristic of staffing a "caretaker" crew to perform only touch labor duties. The MEO cannot possibly perform all of the labor intensive NCC Core Network Services as required by the Keelser LBOS PRD.[2]

An NCC is responsible for the Core Network Services as follows:

- Administer ALL standard network devices connected to the network, such as servers, firewalls, and core backbone routers.
- Configure and maintain all network servers and ATM backbone equipment and devices.
- Maintian, install, upgrade and operate data network systems throughout Keesler AFB.
- Complete Server management, administration, security, and device configuration.
- Implement network device configuration and security changes to comply per higher authority directives.
- Maintain all servers, base information protection suite, and ITN equipment and devices.

The manpower study released by Government for the NCC services showed that the Keesler NCC was staffed by 69 employees before the solicitation was released.

During the timeframe in which the Keesler LBOS was released for competition, the Air Education and Training Command (AETC) NOSC centric initiative was in the planning phase. The goal of the NOSC-Centric initiative was to standardize and streamline network operations throughout all of the AETC installations. Also, the AETC NOSC initiative planned to realign responsibility for the management of several systems from out of the base level NCCs and into the AETC NOSC at Randolph AFB, TX. The primary purpose of this initiative was to reduce the amount of local labor required at each installation to perform the NCC Core Network Services. See Exhibit I-A1: AETC NOSC-CENTRIC Operation. During the period when contractor and MEO proposals were being prepared for the Keesler RFP response, only over-optimistic planning documents regarding potential manpower savings due to NOSC-Centric services consolidation were available. The MEO apparently was influenced by these extremely optimistic potential manpower savings and their unrealistic staffing of the labor intensive workload described in the RFP reflects this.

---

2 Throughout our appeal concerning this issue II, RKR is addressing the MEO's failure to properly staff for the Core Network Services that must be provided by the local Kessler Network Control Center. The local Network Control Center is referenced throughout our appeal as the NCC.

The Gardner Law Firm

**Exhibit II-A1: AETC NOSC-CENTRIC Operation**



When implemented, the AETC NOSC would inherit the Keesler NCC Core Network Services and would use the **theoretically** vastly reduced and streamlined Keesler "caretaker" staff to perform only those duties which could not be performed by remote administration.

AETC NOSC duties follow:

- All Core Network Services inherited from AETC installations – including Kessler AFB – Core Network services
- Technical Solutions for NOSC concentric requirements
- Network Engineering
- Performance Analysis
- Task "caretaker" staff remaining on-site at local installations to perform "touch maintenance"

After the AETC NOSC implementation, the remaining duties to be performed at the Kessler NCC are to be reduced to "touch labor" only. The labor intensive full administration and management of the network devices and server are transferred to the AETC NOSC and the Keesler local NCC duties are transitioned into a supporting role and less labor intensive workload if it worked according to plan, but that has not proven to be so, as reflected in footnote 1, herein. In contrast to the NCC Core Network Service Responsibilities, examples of the "touch labor" provided by a caretaker crew follow.

- Provide **TOUCH MAINTENANCE ONLY** on servers and devices controlled by the NOSC. This includes all servers, base information protection suite, and ITN equipment and devices.
- On-call technician support to respond to after duty hours outages that require touch maintenance.
- Perform Trouble-shoot and restoration services that NOSC cannot perform remotely.
- Initial hardware installation and configuration of network servers and devices in preparation for services to be performed by the AETC NOSC.
- Remove & replace faulty hardware.
- Load and Unload back-up tapes on servers.
- Coordinate with the NOSC and maintain a current status of the outages. Maintain selected lists of equipment and systems.
- Receive and inventory equipment and software.
- Document equipment installation acceptance testing.
- Maintain physical NCC building security. Escort vendor maintenance personnel.

Exhibit II-A2 Keesler LBOS RFP Requirement Milestones shows the original Keesler NCC Workload operation with 69 personnel, the initial RFP requirement for a NOSC-Centric Operation of services, the subsequent deletion of the NOSC-Centric

requirement from the RFP, and the MEO bid of 10 personnel which should never have been certified.

**<u>Exhibit II-A2:</u> Keesler LBOS RFP Requirement Milestones**



"Touch labor," as the term is used herein is a major characteristic of the NOSC Centric environment and does not require personnel in the NCC to fulfill the requirements of the NCC. "Touch labor" is not applicable for anything having to do with the challenged solicitation because there is no NOSC Centric method of operation to which it could apply, yet, the MEO staffing is improperly based upon the NOSC Centric method of operation for performing the services rather than the MEO performing the bulk of services physically at the Keesler NCC. Exhibits II-B and II-C, which are extracted from the MEO's Management Plan, prove RKR's argument on this point to be correct.

**RKR Exhibit II-B:**

This Exhibit is extracted from the MEO's Management Plan Paragraphs 3.2.2.13 (Workload Analysis for the Help Desk) & 3.2.3.13 (Workload Analysis for Network Operations). Each statement by the MEO has multiple mentions of a reengineering effort. The second bullet of each paragraph reads ( See **Attachment II-B**):

> "Domain/server consolidation is currently underway at Keesler AFB, therefore the number of servers is declining but the number of servers under the control of the 81CS will increase. As these servers migrate to the central server farm, *they will be maintained as all other servers. That is, the AETC NOSC will remotely administer these servers; however, touch maintenance may be required on these servers."* *(Emphasis Added)*

The third bullet of each paragraph states:

> "AETC is currently reengineering the base, command-wide. The goal of the AETC NCC Reengineering initiative is to implement a NOSC centric enterprise within AETC. The NOSC centric initiative will standardize and streamline network operations throughout the command. AETC NOSC has the authority to direct standardized network configurations, restoration of services, patching of security vulnerabilities, and coordinate the response to network outages or intrusion attempts."

These descriptions are contrary to the PRD proposal instructions and the previously referenced Q & A T-07-046. While this may or may not be happening currently, the RFP clearly states that bidders are instructed **not** to base their proposal on NOSC Centric method of operation. These instructions apply to all bidders as well as the MEO. However, the MEO statements in this Exhibit, clearly shows that the MEO based their workload staffing assumptions upon a NOSC centric environment where the bulk of the work normally done at the local base level NCC is now accomplished at the AETC

NOSC thus allowing the MEO to bid absolute minimum manning without compliance to the actual requirements spelled out in the RFP.

<u>**RKR Exhibit II-C**</u>:

Further support for RKR's argument that the MEO incorrectly relied on a NOSC Centric method of operation is extracted from Paragraph 3.2.3.5 (Concept of Operations) of the MEO's Management Plan and reads in part (See **Attachment II-B**):

> " Network Operations, *guided by the AETC NOSC*, will provide touch maintenance on NOSC core services including but not limited to: Domain Naming Services (DNS), Dynamic Host Control Protocol (DHCP), file, e-mail, application, servers, and web servers." *(Emphasis added)*

The MEO statements in this Exhibit are, again, not compliant with the requirements of the PRD, sections L, M and 7.1. Touch maintenance <u>**is not**</u> all that is required. In reality, the administration, management, and maintenance of these servers and applications are a requirement of any NCC prior to the NOSC Centric reengineering effort, they are required in this PRD and it is apparent as noted in footnote 1, herein, that even the NOSC Centric method of operation requires much greater staffing than would be provided by the MEO proposal.

<u>**RKR Exhibit II-D**</u>:

This is extracted from the fourth paragraph of "3.2.3.5.1, Normal Operations" of the MEO's Management Plan and states (See **Attachment II-B**):

> "Network Operations, *guided by the AETC NOSC*, will provide "touch-maintenance" on NOSC core services including, but not limited to: Domain Naming Services (DNS), Dynamic Host Control Protocol (DHCP), file, e-mail, application servers, and web services." *(Emphasis added)*

This MEO statement is also not compliant with the PRD/PRD. The network support personnel must perform far more than touch maintenance on core services pursuant to the PRD. Exhibit II-E, herein, shows the manpower that is required when daily administration of servers, routers, and services are conducted physically at the local level (Keesler) rather than the AETC NOSC. The estimated duration amounts are actual estimations originating from AETC's RFP Performance Requirement Documents (**Attachment II-C**) for the Vance AFB Base Operating Services RFP # FA3002-06-R-

0003, which was recently released for competition. As both Keesler and Vance Air Force Bases fall under AETC, it is entirely reasonable for illustration herein to expect a similar effort is required to perform similar functions in similar work sections at each base. It is also reasonable for illustration herein to expect that the NCC/BNC sections at Vance and Keesler would require similar levels of effort to accomplish the individual duties indicated in RKR Exhibit II-E. For the purposes of this protest, Exhibit II-E is based upon the number of servers and routers as provided in the Keesler LBOS PRD. See **Attachment II-D.** The Keesler LBOS PRD figures are flagged by the '*' under the "Qty" column. The "Output in Hrs" column is the result of the ("Qty" multiplied by "Frequency" multiplied by "Estimated Duration") columns. The result indicates 8.5 *additional* Full Time Equivalents (FTE), over what is bid in the MEO proposal, using the MEO's measurement factor of 1,776 hours for each FTE (found in Study Table 11 of the WINCOMPARE database).

**Exhibit II-E:**

Individual Duties contained in the MEO work plan

The failure of the MEO to properly staff the duties reflected in Exhibit II-E is similar to and an example of the MEO's failure to properly staff other critical work as reflected in Exhibits II-F through II-

| Duties / Descriptions as Local Versus NOSC | Qty | Frequency | Estimated Duration | Yearly Output in Hours |
|---|---|---|---|---|
| Manage The Domain Naming Service | 2* | Weekly | 1 hour | 104 |
| Manage the Dynamic Host Control Protocol Service | 2* | Weekly | 1 hour | 104 |
| Provide Daily Administration of Servers (File, Application & E-Mail, Print Servers) | 199* | Daily | 15 Min | 12,437.5 |
| Provide Administration of Routers | 24* | Daily | 15 Min | 312 |
| Total Hours | | | | 12,957.5 |
| X SIAM rate** | | | | 16.91% |
| Total SIAM Man-hours | | | | 2,191.11 |
| TOTAL MAN-HOURS | | | | 15,148.61 |
| FTEs(15,147.32.5 hrs / 1776) | | | | 8.53 |

Notes:
*- Yearly output calculation for those actions requiring Daily frequency is based on 250 work days per year.

| |
|---|
| **- Standard Indirect Allowable Man-hours. From AFMS 00AA at same rate used by MEO's Operational Audit |

RKR's response fulfilled the requirements of the RFP and did not staff for a NOSC Centric method of operation, as the MEO did.[3]

The MEO specifically did not bid the requirements of the PRD regarding the NCC. Their bid obviously was directed at the initial RFP, that was later rescinded and

[3] There is a vast difference between the costs and staffing levels presented by the private contract competition in relation to the drastic reduction in staffing presented by the MEO. This reduction is referred to in the Agency Appeal Response in support of acceptance of the MEO proposal, but there is no explanation as to how the MEO staffing was attained because the MEO failed to justify its significant reduction in manning other than that which is argued herein relating to the MEO's reliance on "touch labor" within a NOSC Centric method of operation. As an aside, but having some enlightening aspect to it, a further example of why the MEO proposal must be rejected is that in any A-76 cost comparison study, any staffing plan that cuts more than 65% in a critical area such as the NCC, as the MEO has done here, is suspect and requires significant explanation and justification. Justification in this case could take the form of innovative approaches to accomplish the work, or tried and proven streamlined processes which justify how a bidder can accomplish the amount of work specified in the RFP. The MEO's proposal contains no such reasonable justification, but relies entirely upon the NOSC Centric approach, which was prohibited in the PRD. The MEO reduction in staff is over 85% in the SC1B section. From all available data, this appears to be a historical milestone never before proposed or accepted in any A-76 competition. The reduction is truly staggering in its proportions and is unacceptable because there is no explanation as to how the MEO can meet the requirements of the PRD with the reduced staffing.

RKR developed an extensive workload analysis of the Network Control Center, Help Desk, and all network-related functions. RKR's staffing numbers accurately reflect the full time equivalents that are necessary to support all requirements of the PRD and perform those duties that the MEO incorrectly applied to the NOSC. In order to perform the mission with no lapses, RKR developed an extensive cross utilization plan to eliminate the possibility of one-deep positions that may result in inadequate or failed support. Each RKR employee has primary and secondary responsibilities assigned to them, some even with more than one secondary responsibility. Within the MEO's Network Operations section, there is only a glossing over of cross-utilization of personnel with no detail or specifics—in other words, no real plan, as required by sections L-901 f.(2)(a through e), L-908 (**Attachment II-E**) and section M-901 b.(3) ii, iii, iv (**Attachment II-F**) in the RFP. This leaves the government vulnerable to mission failure.

the MEO did not consider the effects to the workload which were incorporated into the RFP by the Contracting Office's response **Question #T-07-046 (Attachment II-A).** Further examples and Exhibits support our contention that the MEO proposed staffing is severely deficient in regards to being compliant with the RFP requirements and in their ability to accomplish the critical nature of the NCC workload as shown in the following Exhibits.

**RKR Exhibit II-F:**

This exhibit is extracted from the RFP section 7.4, See **Attachment II-G**, and shows that most services under the NCC are indeed of a critical nature, yet, the MEO staffed these services as touch labor which is clearly insufficient in delivering the full services necessary to resolve any outages of mission critical assets with the 10 personnel proposed by the MEO.

**Exhibit II-F:**

RFP Extract of Section 7.4 of the PRD. See **Attachment II-G.**

7.4.4. Network Control Center Services

| **Network/Computer Outages** | **PRIORITY SERVICE LEVELS** | | |
|---|---|---|---|
| | **Critical** | **Serious** | **High/Med/Low** |
| Mission Critical Assets SIPRNET / NIPRNET / DISN (T-1) / NOTAMS C2IPS / GIS / QIP / Proxy AWDS / GCCS / Network Control Center / SBSS / ABSS / DMS/E-mail / CAMS / DeMS/TG3 IWIMS/ACES / EMIX / | X | | |
| Emergency Services | X | | |
| Airfield Facilities | X | | |
| Network Backbone Components | X | | |
| Key Personnel | X | | |
| Training Class Support (w/training deficiency) 2AF / 81 TRW / 81 TRG / 81 SPTG / 81 MDG / 81 LG/Associate Units / | X | | |
| Operational Support | | X | |
| Other Standard/Specialized Systems | | X | |
| Office Productivity | | | X |

| | | | |
|---|---|---|---|
| Training Class Support (w/o training deficiency) 2AF / 81 TRW / 81 TRG / 81 SPTG / 81 MDG / 81 LG/Associate Units / 403rd Wing | | | X |

Note: Includes trouble/outages for hardware, software, applications, peripheral devices, servers, hubs, switches and routers. A training deficiency is a failure that causes class cancellation or requires the use of alternative, less acceptable teaching methods.

7.4.4.1. Network/Computer Restoration Cycle Times

| Critical | Serious | High | Med/Low |
|---|---|---|---|
| 2 hours | 6 hours | 2 business days | 4 business days |

7.4.4.2. Availability rate of network service shall be:

| Critical | Serious | High/Med/Low |
|---|---|---|
| 99.0% | 98.0% | 97.0% |

7.4.4.2.1. Move/add/changes are completed within 10 business days, and scheduled within a 4-hour time window, if feasible.

7.4.4.2.2. The Combat Information Transfer System (CITS) has been installed. Maps of the proposed CITS projects are available in the Technical Library. The AETC NOSC will remotely administer all devices in the CITS backbone.

7.4.4.3. Secure Communications Service Levels

| Secure Communications | PRIORITY SERVICE LEVELS |
|---|---|
| | Critical (restored within 2 hrs) |
| | |
| SCIF | X |
| GCCS | X |
| SIPRNET | X |
| DMS | X |
| AFOSI GINS Circuit | X |

7.4.12. HELP DESK SEVERITY LIST: The following list identifies areas of possible computer/network problems in terms of mission impact and response time. When a work order is called into the help desk, the work order will be assigned a response level based on the following list. The FSA and/or WM must phone in work orders to the help desk. 81 CS/CC has the authority to change response times to meet mission requirements as needed. NCC

technicians will notify the units of any projected delays or changes in response times.

7.4.12.1. Priority 1 (critical mission impact) Response window = 15 minutes (duty hours)/60 minutes (after duty hours).

7.4.12.1.1. Failure of the base information transfer nodes (ITN).

7.4.12.1.2. Failure of any one of the five integrated digital network exchanges (IDNXs) "T- circuits.

7.4.12.1.3. Failure of the Air Force internet node (AFIN) router and/or timpo router. 7.4.12.1.4. Failure of network management systems.

7.4.12.1.5. Failure of base and/or medical group standard traffic firewalls (non-web traffic).

7.4.12.1.6. Failure of base-wide SIPRNET/NIPRNET connectivity.

**RKR Exhibit II-G:**

This exhibit is extracted from the PRD, 7.2 SERVICE DELIVERY SUMMARY. Service Delivery Summary (SDS) item 7 requires a high standard operational rate of 99.6% for the critical core services. The ten personnel staffing proposed by the MEO cannot reasonably be considered to meet the requirements and high standard identified in this Exhibit.

**Exhibit II-G:**

Service Delivery Summary Extract – See item 7. **Attachment II-H.**

7.2. SERVICE DELIVERY SUMMARY

7. Ensure core services critical to mission accomplishment are operational. Core services under control of the service provider: network infrastructure equipment from the transfer Nodes to the end user.

Standard: Critical core services shall be available and operational at a rate of 99.6% or greater *(Emphasis added)*

**RKR Exhibit II-H:**

This is extracted from the Little BOS QASP documentation. The ten personnel staffing proposed by the MEO does not come close to being sufficient to meet the requirements and standards identified in this Exhibit. In particular, the QASP identifies objective performance threshold of **zero violations or compromises regarding security** for all services which cannot be done with ten personnel with all the other taskings assigned to those ten by the MEO.

**Exhibit II-H:**

Extracted From Little BOS QASP. See **Attachment II-I.**

1. Base Operating Services (BOS) Performance Management Plan (PMP): For this solicitation AETC has implemented a BOS PMP concept in accordance with AFI 63-124 and AETCI 21-107. The Little BOS PMP details the performance measurement plan that will be used to access the service provider's success in meeting the performance thresholds detailed in the Performance Requirement Document (PRD) Service Delivery Summary (SDS). The Little BOS PMP includes the Metric Summary Tables for each metric as well as a QASP for the Airfield Support Services commercial service area. AETCI 21-107 requires a QASP for aircraft maintenance contract services.

**ALL SERVICES**

| Performance Objective | Performance Threshold | Method Of Surveillance |
|---|---|---|

The Gardner Law Firm

| | | |
|---|---|---|
| 1. Provide professional and courteous Base Operating Services to ensure prompt, responsive, and cost effective support in accomplishing Keesler AFB varied missions. | An average rating of 4 on a scale of 1 to 5 on a monthly customer satisfaction survey that has separate assessments in the following areas: Compliance with regulations, Courtesy, Professionalism, Work Place Appearance, Flexibility, Responsiveness, Customer Focus, Cost Effectiveness, Support to IDEA program, and Technical Expertise/Knowledge. | Metric |
| 2. Provide timely and accurate reporting of accident information to Wing Safety Office and Contracting Officer. | No more than 1 late report per month. | Metric |
| 3. Follow appropriate security procedures to ensure no security violations or compromises. | Zero violations or compromises in any month. | Metric |
| 4. Provide timely and responsive records management to ensure compliance with appropriate regulations. | An average rating of 4.0 on a scale of 1 to 5 on a monthly customer satisfaction survey. | Metric |

| | | |
|---|---|---|
| 5. Eliminate Fire, Safety, and Health Violations | Abatement actions on identified safety hazards must be implemented immediately upon identification of a hazard. | Metric |

**RKR Exhibit II-I:**

Extracted from Air Force Instruction (AFI 33-115V1". See **Attachment II-J.** Under the "Security Management" paragraph of this AFI, item number 10 identifies a major workload item not covered by the MEO.

**Security Management:**

10. Does the NM monitor audit and error logs for security violations and misuse? **(6.4.3.4.6.)**

**RKR Exhibit II-J:**

Extracted from the RFP, 7.4.6 WORKLOAD DRIVERS. See **Attachment II-G.**

This exhibit shows the foundation from which the Workload Estimates (Appendix B) were developed. Please note that there are a total of 199 servers indicated (21 Windows 2000 servers + 178 Windows NT 4.0 Servers). Additionally, note 2 at the bottom of the exhibit shows the server workload will actually be growing as servers are consolidated under the control of 81 CS. Note, that the reference to "touch labor" in the footnote is not correct as discussed in the Contracting Officer's response to Question # T-07-046.

**Exhibit II-J.**

Workload Drivers

The table below identifies numbers and types of C&IT equipment currently in use at Keesler AFB. These are base-wide totals upon which Workload Estimates (Appendix 7B) were developed. (Note: server/domain consolidation are currently underway at KAFB. The number of servers will continue to decline as part of this effort.)

| Equipment Type | Type /Model/Operating System | Number |
|---|---|---|
| Base-wide Computers | Windows 9x1 | 4048 |
| | Windows 2000 Servers2, 3 | 21 |

| | | |
|---|---|---|
| | Windows NT 4.0 Servers2, 3 | 178 |
| | Windows NT/2000 Workstations1 | 4494 |
| | SCOUNIX | 9 |
| | REDHAT LINUX | 2 |
| | HP Unix 10.20 | 4 |
| | Solaris 2.5.1 | 5 |

Notes: [1] Currently PC-COE is being fielded across KAFB. The number of Windows 9x and NT machines will continue to decline and the number of Windows 2000 Professional will rise. [2] Domain/server consolidation is currently underway at KAFB. As a result the number of active servers is declining. The number of servers under the control of 81 CS will increase. As these servers migrate to the central server farm, they will be maintained as all other servers. That is, the AETC NOSC will remotely administer those servers, however, touch maintenance may be required on those servers.

[3] KAFB is migrating to Windows 2000 Server/Advanced Server. The number of Windows NT machines is expected to decline as a result.

[4] CITS Phase III is currently installing new fiber optic cable on KAFB.

[5] Cable 03 is currently being replaced under contract; number of pairs will remain the same.

The AFI, AFM and other directives incorporated by reference into the RFP requirements by "Appendix 7.A. Publications" (See **Attachment II-K**), identify an enormous amount of work that must be accomplished at the local NCC level. AFI 33-115V1 item 10 under the "Security Management" paragraph as depicted in RKR Exhibit II-I identifies a major workload item not covered by the MEO (**Attachment II-J**). The AFI in this case guides the creation of a checklist that requires system administrators to include a review of server audit logs for security and integrity purposes. This AFI in conjunction with the QASP standard for security violations mandates a daily review of the audit logs by the system administrators for security violations and general system integrity. This means that the audit logs which should exist on all 199 servers identified in the RFP must be reviewed on a daily basis. The MEO provides no rationale or innovative approach or streamlined processes to accomplish this seemingly basic task and it cannot be accomplished with 10 personnel.

The foregoing examples of the shortcomings of the MEO proposal clearly show that it would be unreasonable to certify the MEO proposal. However, another illustration of the shortcomings of the MEO proposal is, by example, taking just this one task and

performing an operational audit of the effort required to perform daily reviews of the server audit logs is shown in RKR Exhibit II-K, below.

Basic assumptions are made regarding this Exhibit II-K. Security is a core daily requirement. No automated logon and review processes or enterprise software tool is identified in the RFP which is truly capable of performing and identifying security and integrity issues through the review of the audit logs. The effort reflected in the exhibit does not further identify the significant effort and time involved in reporting and resolving a bona-fide security or integrity problem which may be discovered. RKR used a unit time of 14.7 minutes, which is a conservative estimate considering that system logs are very large when the servers are secured properly. The larger system logs are due to additional audit settings and policies mandated by security requirements, which causes tracking of system events beyond default configuration. Furthermore, this is a conservative estimate based on only 250 work days per year. In reality, any server that is not powered down and is still connected to any active network should have system logs reviewed each and every day they are in service.

**Exhibit II-K:**

**Daily Effort Required To Review Server Audit Logs for Security and Integrity.**

| **ACTION** | **Time Required** | **Number of Servers** | **Frequency** | **Total Hours Required** |
|---|---|---|---|---|
| Manually logon to server, locate and review Audit Logs, logoff | 14.7 Minutes | 199 | Daily | 48.76 |
| Yearly Total (based on 250 work days a year) | | | | 12,190.0 |
| **X SIAM rate** | | | | **16.91%** |
| **Total SIAM Man-hours** | | | | **2,061.3** |
| **TOTAL MAN-HOURS** | | | | **14,251.3** |
| **FTEs Required ( 14,251.3 hrs / 1776)** | | | | **8.0** |
| * - Yearly Total (based on 250 work days a year<br>**- Standard Indirect Allowable Man-hours from AFMS 00AA at same rate used by MEO's Operational Audit | | | | |

**RKR Exhibit II-L**:

This Exhibit is extracted from 1.5 and 1.6 of the Summary of Expectations and also from the RFP 7.4.6. It is clear from the MEO statements (in the previous Exhibits)

that they are staffing for "touch labor" only. Per the PRD, they should be staffing for full service and therefore do not meet the Government's own expectation of providing "best practice" expertise in staffing the requirements of the NCC. Additionally, the MEO simply does not show comprehension or understanding of customer needs or work drivers as expressed in 1.61 and 1.6.10, as depicted in Exhibit II-L. The STATEMENT OF EXPECTIONS sets the expectations for ALL bidders, to include the MEO, and the MEO failed to meet the required expectations.

This Exhibit II-L is extracted from Statement of Expectations (**Attachment II-L**)

> *1.5. STATEMENT OF EXPECTATIONS: We expect the service provider to provide services that effectively support military readiness, military operations, Keesler's training mission, and Keesler's tenants. Keesler expects the service provider to support hospitable, safe and reliable living and working environment. Using "best practice" expertise, the service provider is expected to provide fast, flexible, customer focused services that achieve consistent quality and continuous improvements in efficiency.*
> *1.6. CUSTOMER CARE: Customer focus is a critical success factor at Keesler.*
> *Service provider is expected to excel in customer care. Customer care is:*
> *1.6.1. Understanding customer needs.*
> *1.6.2. Responding to customer requests – professionally and promptly.*
> *1.6.3. Having flexibility and surge capability.*
> *1.6.4. Communicating effectively and managing relationships.*
> *1.6.5. Communicating proactively.*
> *1.6.6. Echoing back request as understood.*
> *1.6.7. Closing communication loops.*
> *1.6.8. Building a customer knowledge base.*
> *1.6.9. Tracking and measuring performance for all requests.*
> *1.6.10. Measuring customer satisfaction and understanding drivers.*

Next, as indicated earlier, the publications that are incorporated by reference into the RFP indicate a tremendous amount of workload that a "full service" NCC must accomplish. RKR Exhibit II-M is provided here to show that the true amount of work and responsibility that an NCC must accomplish is far more than what the MEO Management identifies in their Management Plan.

**Exhibit II-M:**

This is extracted from the Air Force Enterprise Network Management

Architecture publication (**Attachment II-M**) which was incorporated by reference in the RFP.

## A3-5. INFORMATON FLOW MANAGEMENT

Operations for conducting information flow management are similar to those for infrastructure management, except the focus is on logical flow of information and quality of service instead of performance of physical devices. Not every packet, cell, or frame traversing the network has the same priority; information flow management ensures the optimal delivery of data to support line-of-business applications. Network managers and enterprise controllers assess equipment configuration, capacity, and performance to ensure information flow reliability and effectiveness. Resulting assessment reports are used as the basis for additions and changes to network infrastructure, network device configuration, and network usage policies.

## A3-6. NETWORK CORE SERVICES MANAGEMENT

Network administrators and enterprise controllers configure, install, and manage services to support organizational mission requirements. Examples include NIPRNET/SIPRNET access and Domain Name Service (DNS) management.

## A3-7. NETWORK DEFENSE OPERATIONS

Network operations organizations perform network defense by operating intrusion detection and vulnerability assessment tools on AF networks. Information protection operators and network defense controllers execute internal network defense ROE, countermeasures, and other course of action in response to command direction and INFOCONs. Network operations organizations direct and assist subordinate AF network operations organizations to execute equivalent actions to control malicious events and perform AFCERT Advisory Compliance Message (ACM) follow-up. Network operations organizations receive consolidated intrusion detection reports and data, assess the compiled data, and report the results to the appropriate command authorities.

## A3-8. FCAPS ROLES AND RESPONSIBILITIES

Table A3-1 contains the FCAPS roles and responsibilities for the AFNOC, NOSC, and NCC. The table is organized by FCAPS category (i.e., FM, CM, AM, PM, and SM), subcategory, description, and network control organization.

| Table A3-1, FCAPS Roles & Responsibilities to Network Organization Matrix | | | | | |
|---|---|---|---|---|---|
| FCAPS | | | Applicability | | |
| Category | Sub Category | Description | NCC | NOSC | AFNOC |
| FM | Detection | Respond to escalated trouble calls from NOSCs and Direct Reporting Unites (DRUs) (Help Desk Operations) | X | X | X |
| | | Respond to failures and degradations detected by AFNOC tools tracking | X | X | X |
| | | FAB maintain enterprise problem resolution database (Remedy ARS) | X | X | X |
| | | Immediate Feedback and information dissemination services to NOSCs | X | X | X |
| | | Feedback on AF Enterprise faults as provided by automated tools and the impact to | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| | | operational missions | | | |
| | Resolution | Coordinate with DISA/Defense Information Technology Contracting Office (DITCO) to ensure proper activation and restoration of DoD services | X | X | X |
| | | Coordinate and provide on-site support when required and requested by the NOSC and DRUs | X | X | X |
| | | Coordinate with commercial vendors on commercial-off-the-shelf (COTS) products | X | X | X |
| | | Coordinate with NOSCs and affected NCC on the status of the resolution | X | X | X |
| | | Coordinate with DISA/DITCO ensuring proper activation and restoration of DoD priority circuits | X | X | X |
| | | | | | |
| CM | | Provide network baseline configuration software support, maintain baseline media library, | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| | | and distribute network computer products | | | |
| | | Perform and plan capacity adjustments, interoperability testing, performance modeling, and vulnerability assessment for changes to the baseline | X | X | X |
| | | Monitor the configuration, control configuration changes, and analyze utilization of wide are networks (WANs), both unclassified and classified | X | X | X |
| | | Obtain and maintain AF-wife site licenses for all AF units through a central software control board | X | X | X |
| | | Provide AF-wide IP address management, validating usage, structure, and requirements for AF bases | X | X | X |
| CM | | Manage the AF enterprise DNS | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| | | and Reverse Address Resolution Protocol (RARP) | | | |
| | | Interface with source agencies for line-of-business applications performance for enterprise network management | X | X | X |
| | | | | | |
| AM | | Use end-to-end network performance metrics to advocate for enterprise information assurance improvements and modernization | X | X | X |
| | | Determine Total Cost of Ownership (TCO) for systems utilizing the enterprise network | X | X | X |
| | | | | | |
| PM | | Monitor and archive AF enterprise information flow characteristics (i.e., bandwidth and traffic usage) for AF SDPs, and provide real-time view to the | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| | | NOSCs | | | |
| | | Provide PMOs feedback on performance impact of program software and hardware to enterprise network | X | X | X |
| | | Implement, coordinate, reports, and track Information Condition (INFOCON) statuses | X | X | X |
| | | | | | |
| SM | | See the Information Protection Architecture for details | X | X | X |
| | | | | | |

**Table A3-1. FCAPS Roles & Responsibilities to Network Organization Matrix**

Next, RKR Exhibit II-N reflects the cost of what is a reasonable adjustment in staff to fully support the workload identified in PRD for the SC1B section. This Exhibit accounts for the 8.53 additional FTEs identified in Exhibit II-E and also for the 8.0 FTEs identified in Exhibit II-K. Therefore, there is a total of 16.53 FTEs accounted for in this Exhibit and that cannot be accomplished with the ten personnel proposed by the MEO.

**Exhibit II-N.**

Cost of Additional Employees for Network Operation Function not provided for by the MEO ten personnel, but required by the PRD.

| | Section SC1B<br>Grade IT9 |
|---|---|
| **Period 1** | **$15,993.73** |
| **2** | **77,094.99** |
| **3** | **80,555.53** |

| | |
|---|---|
| 4 | 83,706.97 |
| 5 | 87,222.66 |
| 6 | 90,886.01 |
| 7 | 94,965.58 |
| 8 | 98,680.76 |
| 9 | 102,825.35 |
| 10 | 107,144.02 |
| 11 | 111,953.36 |
| Sub Total | 951,028.96 |
| Overhead | |
| 11.9966% | 114,091.27 |
| | |
| Total Per Person For All Periods | 1,065,120.23 |
| 16.53 | $17,606,437.40 |

**The Air Force Appeal Response** (Attachment I-C, page 2)

The Appeal Response found that our argument was accepted as an appealable item but was not substantiated. The response extracted from the document on the matter was as follows:

> **Discussion.** RKR appeal alleges the MEO did not properly staff Network Operations. It further states the MEO improperly applied a Network Operations Security Center (NOSC) Centric method as its staffing strategy. Our examination revealed there were areas in the PRD and the MEO Management Plan which mentioned Network Control Center (NCC) Re-engineering or NOSC-centric within the documents. The PRD referenced NCC reengineering offered insight to future Air Force plans that may be of interest to the selected service provider. In fact the MEO Management Plan does reference "touch maintenance," however, does not refer to how the MEO will staff the Network Operations.
>
> Exhibits in the RKR appeal reference several instances where they allege as examples of MEO utilizing NOSC-centric methodology. However, the lead paragraph of both sections

mentions Network Operations have been adequately staffed to respond to both surge and day-to-day requirement on a 24/7 basis if necessary.

Additionally, the Management Plan goes on to explain, "...the PRD identified the following initiatives that could impact workload; however, the impact could not be quantified:

- AETC is currently reengineering the base Network Control Centers (NCC) command-wide. The goal of the AETC NCC Re-engineering initiative is to implement a NOSC centric enterprise network within AETC. The NOSC centric network will standardize and streamline network operations throughout the command. AETC NOSC has the authority to direct standardized network configurations, restoration of network services, patching of security vulnerabilities, and coordinate the response to network outages or intrusion attempts."

This statement demonstrates the MEO is aware of potential changes to current operations, but those changes or NOSC-centric operations were not quantified in the Management Plan. Thus the MEO staffing is based upon the PRD requirements.

There is no basis for the conclusion of the foregoing Response and RKR's agency protest and this protest show that none could exist, because the facts clearly establish the validity of RKR's protest. The Agency Appeal response correctly quoted statements made by the MEO in the Management Plan and the Agency Appeal team but incorrectly accepted the MEO plan as reasonable. The Agency Appeal team ignored to statements in the MEO plan that directly contradict the Appeal team findings. Exhibit II-B: MEO Management Plan Workload Analysis 3.2.3.13 as shown on page 3-28 of the MEO Management Plan Part 3 **(Attachment II-B)** shows this. The Agency Appeal team chose to find as credible in their findings that "Network Operations (SC!B) has been adequately staffed to respond to both on a 24/7 basis if necessary," as opposed to the last two (2) statements of the exhibit that actually portrays the MEO's incorrect understanding of the work they will perform as touch labor for all servers. The two statements are: 1) "As these servers migrate to the central server farm, they will be maintained as all other servers;" and, 2) "[t]hat is, the AETC NOSC will remotely administer those servers; however, touch maintenance may be required on those servers." The Agency Appeal Response lacks all logic and is unreasonable.

**Exhibit II-O of the MEO Management Plan Workload Analysis 3.2.3.13, is the following:**

> ***3.2.3.13 Workload Analysis.*** The PRD depicts historical workload data for day-to-day and surge requirements. Network Operations (SC1B) has been adequately staffed to respond to both on a 24/7 basis if necessary. The PRD identified the following initiatives that could impact workload, however, the impact could not be quantified:
>
> - PC-COE is being fielded across Keesler AFB, therefore the number of Windows 9x and NT machines will continue to decline while the number of Windows 2000 Professional will rise.
> - Domain/server consolidation is currently underway at Keesler AFB, therefore the number of servers is declining, but the number of servers under control of the 81CS will increase. As these servers migrate to the central server farm, they will be maintained as all other servers. That is, the AETC NOSC will remotely administer those servers; however, touch maintenance may be required on those servers.

The Agency Appeal Authority incorrectly accepted the MEO's explanation that "future initiatives could impact workload: however the impact could not be quantified." It is obvious the MEO is employing the inapplicable NOSC Centric method of operation in order to claim that ten personnel can perform this function that was previously performed by 69 personnel. In point of fact, the 10 employee staff proposed by the MEO is the touch maintenance "caretaker" staff that is referenced in the Exhibit II-P: PRD 7.4.11 as found on page 7-4-13 See **Attachment II-G**. Remember, Exhibit II-P, PRD 7.4.11 is a conditional prediction of future Air Force planning that is inapplicable to this challenged solicitation.

**Exhibit II-P:**

**PRD 7.4.11**

> 7.4.11. AETC is presently reengineering the base network control centers (NCCs) command-wide. The goal of the AETC Network Control Center (NCC) Reengineering initiative is to implement a Network Operations and Security Center (NOSC) centric enterprise network within AETC. This NOSC centric network will standardize and streamline network operations throughout the command, while at the same time reducing required NCC manning. AETC is

currently moving toward Network Operations Security Center (NOSC)-centric management of base information infrastructure. The end result is AETC NOSC management of the Keesler communications infrastructure with only touch maintenance performed by a "caretaker" crew at base level.

7.4.11.1. The AETC NCC reengineering initiative brings responsibility for several functions and management of several systems out of the base level NCCs and into the NOSC. The following functions are be affected by this initiative; Core Network Services, Technical Solutions for NOSC concentric IT requirements, Performance Analysis, and Network Engineering. This PRD is designed to show how Keesler anticipates the conclusion of the NOSC concentric effort will affect services and the workload our communications & IT service provider.

Exhibit II-P is the original requirement of the Keesler LBOS PRD that was supplanted by the 2003 changes to the RFP, as shown in Exhibit II-R: Contract Officer Response to Question #T-07-046, addressed elsewhere herein. The foregoing paragraphs 7.4.11 and 7.4.11.1 were retained in section 7.4 because the NOSC-centric initiative was still a long range goal. Note from this exhibit that the prime areas to be affected are identified as the Core Network Services. These are precisely the services provided by a fully functional NCC (SC1B section) where all work is performed at the local site not by remote administration or by the AETC NOSC. However, the SCIB section that is responsible for the Core Network Services is precisely the area in which the MEO made the unjustifiable manpower reduction of 89.3% as shown in Exhibit II-X.

The Agency Appeal team acknowledged that they reviewed the MEO Management Plan, but its interpretation of the opening paragraph of the SC1B section Concept of Operations. Exhibit II-Q: Opening Paragraph of SC1B Concept of Operations found on page 3-23 of the MEO Management Plan Part 3 **(Attachment II-B)** was incorrect.

**Exhibit II-Q:**

**Opening Paragraph of SC1B Concept of Operations**

***3.2.3.5 Concept of Operations***

*3.2.3.5.1 Normal Operations.* Network Operations will provide Operations and Maintenance (O&M) functions, including security, with the assistance of AETC NOSC for all systems connected to

Keesler's network infrastructure. This also includes stand-alone systems and LANs such as KENET and the base library LAN.

Exhibit II-Q clearly shows that the MEO intends to perform core Network Operation requirements with the assistance of the AETC NOSC for ALL systems. This is contrary to the Contracting Officer's response as provided to the Agency Appeal Team in the RKR Administrative Appeal listed under **Question # T-07-046** and the **Response by Contracting Officer** reprinted below. These are contained in **Attachment II-A.**

**Question # T-07-046**

"Previous versions of the PRD mentioned "NOSC centric" management, monitoring, configuring, and troubleshooting of all core services (DNS, DHCP, file, web, applications, e-mail, and firewall servers). Section 7-1 removes all references to the NOSC centric method of enterprise network administration and further indicates that the service provider installs operates, and maintains network infrastructure that provides internal and external connectivity of Keesler AFB, ensuring interoperability with other Air Force Systems. However, Section 7.4, paragraph 7.4.1.1 indicates AETC is presently reengineering the BNCC command wide with a goal of NOSC-centric enterprise network. It seems strange that the NOSC-centric concept was a major part of section 7-1 previously and now it is conspicuously absent. Please clarify the current status of this initiative and provide information about estimated completions of this initiative. Will it be in place at CSD? Is the service provider expected to staff and describe their methodology to perform the work in a NOSC-centric environment or a non-NOSC-centric environment?"

**Exhibit II-R:**

**This Exhibit is the Response by Contracting Officer to the foregoing Question T-07-046**

"All references to the NOSC-centric initiative were removed from section 7-1, due to funding and manning issues that have *halted its implementation*. The reference to the NOSC-centric initiative was retained in section 7.4 (General Information) because this program is still *a long-range goal*. The status of the NOSC-centric initiative and timelines will be updated in section 7-4 as they become available. *Section 7.1 contains the requirements that the service*

> *provider must meet and section 7-4 simply offers an insight to the Air Force's future plans* that may be of interest to the Service Provider." *(Emphasis added)*

This question and subsequent answer clearly show that, when developing the proposal, core services such as DNS, DHCP, file, web, application, e-mail, and firewall servers and routers are to be administered, managed, and maintained by personnel physically located at the NCC, not the NOSC. The MEO is clearly not compliant with the PRD by bidding "touch labor" only. "Touch labor" is a major characteristic of the NOSC Centric environment. The MEO staffing is improperly based upon the NOSC performing the services rather than the MEO performing the bulk of services physically at the Keesler NCC.

The argument in this protest shows that the Agency Appeal Team response, as shown in Exhibit II-A, herein, among other reasons argued, failed to reasonably evaluate the MEO statements in Exhibit II-B. By example, MEO Management Plan Workload Analysis 3.2.3 clearly and incorrectly shows that the MEO expects more servers to be migrated into the central server farm and that AETC NOSC will remotely administer the servers. The MEO statements further indicate that touch labor "may" be required on the servers. These statements can only be taken to mean that the MEO is **not** expecting to perform direct core administrative services for any of the servers in the server farm and that the MEO expects to perform only "touch maintenance" when required. The MEO's insufficient staffing of the SC1B sections is pointed out and quantified throughout our Administrative Appeal documentation and herein.

The Agency Appeal Response unreasonably accepted the MEO statement that "Network Operations have been adequately staffed to respond to both surge and day-to-day requirements on a 24/7 basis if necessary." This statement is not supported by the MEO staffing because there are only a total of ten MEO employees staffed for the SC1B section. This number of employees is woefully insufficient and is critically deficient for the PRD requirements.

The Agency Appeal response to item #5, noted below, incorrectly accepts that the SC1B will be staffed by GS incumbent employees, as is shown in Exhibit II-S:

> **<u>Exhibit II-S:</u>**
>
> **This is the Administrative Appeal Response to Item #5**
>
> The proposed MEO will be made up of *all civilian fully-qualified, incumbent workforce* at the start of contract service. Obviously, these employees would not require the same amount of training as a

> completely new workforce. The resultant training cost estimate may seem low to a private sector provider; however, the methodology used to determine the training cost is *sound and rational*. (emphasis added)

Contrary to this finding, the SC1B will only be staffed by two (2) incumbent GS employees as shown below in Exhibit II-T: Original Staffing for Network Operations as shown on pages 4-2 and 4-3 of the MEO of the Management Plan Part 4 **(Attachment V-D).** Under the "Current" column of this exhibit, the MEO identifies a total of three (3) GS incumbent employees composed of one GS-11, one GS-09, and one GS-04. The GS-04 employee is dropped as indicated in the "Delta" column thus leaving the only remaining two (2) incumbent employees carried over to the MEO staffing plan. The "Delta" column shows that one (1) GS-12, one (1) GS-11, five (5) GS-09, and one (1) GS-07 which have to be non-incumbent employees are added to the MEO Staff. That is unreasonably deficient to support the required workload.

**<u>Exhibit II-T:</u>**

**This is the Staffing Prior to the MEO Staffing Proposed in its Response to the A-76 Process for Network Operations and the reductions of the MEO proposal.**

| Network Operations | | | |
|---|---|---|---|
| Grade | Current | MEO | Delta |
| Capt | 1 | 0 | -1 |
| CMSgt | 1 | 0 | -1 |
| MSgt | 3 | 0 | -3 |
| Tsgt | 6 | 0 | -6 |
| SSgt | 14 | 0 | -14 |
| SRA | 27 | 0 | -27 |
| A1C | 14 | 0 | -14 |
| GS-12 | 0 | 1 | +1 |
| GS-11 | 1 | 2 | +1 |
| GS-09 | 1 | 6 | +5 |
| GS-07 | 0 | 1 | +1 |
| GS-04 | 1 | 0 | -1 |
| **Total** | **69** | **10** | **-59** |

**<u>Exhibit II-U:</u>**

This is the MEO SC1B Section Staffing as shown on page 6-2 of the MEO Management Plan Attachment 6 **(Attachment II-N)** follows. This exhibit shows that only ten GS employees will replace the original 69 employees in this section.

**<u>Exhibit II-U:</u> MEO SC1B Section**

| OSC | OSC Name | Classification/ Duty Title | GS/FWS Designation | Classified (Primary Skill | Grade | First Skill Series | Secondary Skill S | Tertiary/Additional Skill | Security | **Number of Personnel | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| SC 1B | Network Operations | *Supervisory Information Technology Specialist/Network Services Branch Manager | GS | 2210 | 12 | 2210 | 2210 | | S | 1 | SC1B Total: 10 |
| SC 1B | Network Operations | Information Technology Specialist(Network Services) | GS | 2210 | 11 | 2210 | 2210 | | S | 1 | |
| SC 1B | Network Operations | Information Technology Specialist(Systems Administrations) | GS | 2210 | 11 | 2210 | | | S | 1 | |
| SC 1B | Network Operations | *Information Technology Specialist(Security)/Wing Assistant Information Assurance Manager | GS | 2210 | 09 | 2210 | 0391 | | TS | 2 | |
| SC 1B | Network Operations | Information Technology Specialist(Network Services/Custo | GS | 2210 | 09 | 2210 | 2210 | | S | 4 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | mer Support) | | | | | | | | | |
| SC 1B | Netwo rk Opera tions | Computer Assistant/Web Developer | GS | 03 35 | 0 7 | 033 5 | 03 35 | 033 5 | S | 1 | |

**Exhibit II-V:**

This is the MEO Analysis of Resources Impact as shown on page 4-1 of the Management Plan Part 4 **(Attachment V-D)** shows the drastic staffing cuts that the MEO made in the SC1B area.

**Exhibit II-V:**

**MEO Analysis of Resources Impact**

| CURRENT FUNCTIONS | CURRENT REQUIRED | MEO FUNCTIONS | MEO REQUIRED | DELTA |
|---|---|---|---|---|
| CC<br>SCPP<br>SCPI<br>SCPV<br>SCBA | 21 | SC1<br>(Projects Support) | 12 | -9 |
| SCMJ<br>SCBB | 10 | SC1A<br>(Help Desk Job/Material Control) | 7 | -3 |
| SCBE<br>SCBF<br>SCBB<br>SCBBA<br>SCBA | 69 | SC1B<br>(Network Operations) | 10 | -59 |
| SCBB<br>SCMF<br>SCMP<br>SCMW | 39 | SC1C<br>(Base Communication Services) | 13 | -26 |
| Total | 139 | Total | 42 | 97<br>(69.7%) |

**Exhibit II-W:**

**Unreasonable MEO Manpower Reductions as compiled by RKR.**

| Current Functions | Current Required | % of original workload | MEO Functions | MEO Required | Delta | Staffing Difference | % of Total FTE Reduction |
|---|---|---|---|---|---|---|---|
| CC, SCPP,SCP1, SCPV, SCBA | 21 | 15.11% | SC1 | 12 | -9 | -42.86% | 9.28% |
| SCMJ, SCBB | 10 | 7.19% | SC1A | 7 | -3 | -30.00% | 3.09% |
| SCBE,SCBF, SCBB,SBBBA,SCBA | 69 | 49.64% | SC1B Network Operations | 10 | -59 | -85.51% | 60.82% |
| SCBB, SCMF, SCMP, SCMW | 39 | 28.06% | SC1C Base Comm | 13 | -26 | -66.67% | 26.80% |
| Total | 139 | | Total | 42 | -97 | -69.78% | |

As shown in Exhibit II-W, above, the MEO reduced staff by 85.5% in the SC1B area. The next closest reduction in terms of percentages occurs in the SC1C section with a total of a 66.67% reduction, which is also an unreasonable cut of manpower. Yet, the two remaining sections were each cut less than 43%. The total impact of the drastic cuts in the SC1B area reflect that these manpower reductions make up over 60% of the total manpower reductions to the entire SC1 branch. The next closest cut in terms of percentages is made in the SC1C section which impacts total manpower reductions by only 26.8 %. The manpower cut in the SC1B section is truly an unrealistic and unjustified reduction in personnel and is not consistent in the extent of manpower reductions made by the MEO in other areas. The MEO fails to justify these drastic cuts in manpower.

In addition, Exhibit II-X, below, is based on the MEO's unreasonable Consolidation of Functions into the SC1B section per the 3.2.3.5 Concept of Operations found in the MEO Management Plan **(Attachment II-B)**. This break-out shows an even greater unacceptability of the MEO's proposal. This is because the MEO has multiple functions assigned to the ten people in SC1B which further dilutes the MEO's ability to fulfill the requirements of the PRD.

**Exhibit II-X:**

**Functions Consolidated Into the MEO SC1B Section as Compiled by RKR**

| Function | Original Staff | MEO Staff | % Difference |
|---|---|---|---|
| The original SCI Chief position transferred into the MEO SC1B Chief position. Under the MEO, this position also functions as primary backup to the SC1 MEO Chief. This position is mostly administrative and managerial in nature leaving little or no time to do technical support work. | 1 | 1 | 0% |
| Network Security/Information Assurance (NS) will be responsible for all base security programs including, but not limited to COMSEC, COMPUSEC, EMSEC, and IA. NS is responsible for Certification and Accreditation (C&A) of systems, and manages Time Compliance Network Orders (TCNO) compliance for the base. | 2 | 2 | 0% |
| Internet Services/Web Development (IS) encompasses all duties pertaining to base Internet and Intranet including Web Development, O&M of public and restricted web servers, postings of Web content, 508 compliance, assisting web developers, monitoring web server performance and security, managing the Web Review Board, and monitoring Internet Release Packages (IRP). | 1 | 1 | 0% |
| Network Management (NM) performs O&M functions on infrastructure equipment such as routers, switches, hubs, network interface cards (NIC), etc. NM will utilize network performance tools to monitor, analyze, and optimize network performance. | <u>64</u> | <u>6</u> | <u>89.3%</u> |
| Network Administration (NA) performs O&M activities on network servers, standalone servers, and workstation hardware and software. Manages all domain user and e-mail accounts, and serves as Remedy database administrator. | | | |
| Total | 69 | 10 | 85.5% |

This Exhibit II-X shows that the MEO consolidated 2 additional functions into the SC1B section. Those functions being Network Security/Information Assurance and Internet Services/Web Development. In the MEO's plan, the SC1B chief is also the primary backup to the SC1 MEO Chief. This position is mostly administrative and managerial in nature leaving little or no time to do technical support work. This exhibit shows that the MEO unrealistically dedicated only six (6) employees to handle the PRD Network Control Center requirements which were previously staffed by sixty-four (64)

personnel. The actual manpower reduction of the Core Network Services of the NCC functions is actually 89.3%. A review of these facts point to the following conclusion postulated by the MEO staffing the SC1B section: The MEO and the Air Force Appeal Team believe that two (2) incumbent GS employees along with four (4) non-incumbent GS employees can effectively perform all of the NCC requirements that were previously performed by one (1) Air Force Officer, sixty-five (65) Enlisted Personnel, and three (3) incumbent GS employees. This assumption made by the MEO and the Air Force Appeal team is totally unreasonable and should never have been certified.

**Exhibit II-Y, below,** shows the poorly developed management of duty Hours From 7.4.10 as shown on page 7-4-13 of the Keesler LBOS PRD General Information **(Attachment II-G)** that details other duty hours that were not covered by the MEO Management Plan or their costs.

**Exhibit II-Y:**

7.4.10. UNUSUAL DUTY HOURS: The following information is provided for C&IT
functions performed outside the normal duty day (Monday-Friday, 0700-1700).

| Duty Area | Duty Hours | Duty Days | Remarks |
|---|---|---|---|
| Base Comm Center | 24 Hour operation | All | |
| NCC Help Desk | 0600-1800 | Monday-Friday | NCC Help Desk will be transferred to the AETC NOSC after duty hours. |
| NCC Systems Administration | 8 hours additional duty after 1630, as needed | Per week | Used to work systems issues after peak periods |
| NCC Systems Administration | One extra 8-hour day, normally on a Saturday, as needed | Per Month | Used to work systems issues after peak periods |
| NCC Network Operations | 4 hours additional duty after 1630, as needed | Per Week | Used to work equipment issues after peak periods |
| NCC Network | One extra 4-hour day, | Per Month | Used to work |

| | | | |
|---|---|---|---|
| Operations | normally on a Saturday, as needed | | equipment issues after peak periods |
| All NCC Duty Positions | Average of 16 extra duty hours, as needed | Per Month | Extra time to support contingencies, emergencies, exercises, etc. |

Exhibit II-Y duty hour staffing does not reflect any SC1B overtime charges in any of their costs within the COMPARE program, as it should. Additionally, the MEO failed to provide any coverage of the duties reflected in the last line of the table above. There were no dollars allocated to pay for overtime in the SC1B section, yet, Exhibit II-Y shows that ALL NCC duty positions average 16 overtime hours, as needed, per month to support contingencies, emergencies, exercises, etc. for functions performed outside of normal duty hours (Monday-Friday, 0700-1700). Since the MEO allotted only ten people in the SC1B area, then at a minimum, the MEO failed to account for 1920 hours of overtime pay per year. This amounts to 21,120 total hours over the 11 year life of the award, as depicted in Exhibit II-Z: MEO Unusual Duty Hours Shortfall as compiled by RKR.

**Exhibit II-Z:**

**MEO Unusual Duty Hours Shortfall**

| Period | SC1B MEO Staff | Hours Per Month | Total Shortfall Hours Per Month | Months Per Year | Yearly Total Shortfall Hours |
|---|---|---|---|---|---|
| 1 | 10 | 16 | 160 | 12 | 1920 |
| 2 | 10 | 16 | 160 | 12 | 1920 |
| 3 | 10 | 16 | 160 | 12 | 1920 |
| 4 | 10 | 16 | 160 | 12 | 1920 |
| 5 | 10 | 16 | 160 | 12 | 1920 |
| 6 | 10 | 16 | 160 | 12 | 1920 |
| 7 | 10 | 16 | 160 | 12 | 1920 |
| 8 | 10 | 16 | 160 | 12 | 1920 |
| 9 | 10 | 16 | 160 | 12 | 1920 |
| 10 | 10 | 16 | 160 | 12 | 1920 |
| 11 | 10 | 16 | 160 | 12 | 1920 |

| | | | | | |
|---|---|---|---|---|---|
| Total for all Periods | | | | | 21120 |

In addition to the unaccounted for overtime identified in Exhibit II-Z, coverage of all SC1B workload requirements as proposed by the MEO are adversely impacted by data contained in **Exhibit II-AA**: SC1B Hours of Operation, shown below, and as shown on page 3-26 of the MEO Management Plan Part 3 **(Attachment II-B)**, where the MEO lays out their weekly schedule for staffing the SC1B area. The MEO indicates they will staff one (1) employee on swing-shift 3:00 PM – 1200 midnight each duty day. Since the MEO has only staffed this section with ten employees, this effectively means that, as a maximum, there are only 9 employees available to handle the primary day shift. The MEO further states that they will staff at least one Sunday a month for scheduled downtime. Additionally, the MEO states that they will work a compressed work schedule (CWS). The CWS means that at least every Friday, there will only be half the manpower available to perform the primary dayshift duties. Due to the CWS, the swing-shift staffing, and the one time per month weekend staffing compounded by the fact that no overtime was allotted by the MEO, this effectively means that every Friday, there is only an available pool of 4 or 5 employees from which to staff the required shifts; and that at least one other time per month there is only an available pool of 8 personnel to staff the day shift requirements. That unacceptable and unreasonable to meet PRD requirements and unworthy of certification.

**Exhibit II-AA:**

**SC1B Hours of Operation**

***3.2.3.6 Hours of Operation***. Network Operations (SC1B) will work a CWS, excluding Federal holidays, as follows: Standard Week: Monday – Thursday, 7:00 AM – 5:00 PM; Friday, 7:00 AM – 4:00 PM; and Compressed Week: Monday – Thursday, 7:00 AM – 5:00 PM. In addition, a technician will work from 3:00 PM – 12:00 midnight on each duty day. Services beyond these hours of operation will be on an on-call basis through the Help Desk (SC1A). One or two technicians will work the training CWS schedule as follows: Standard Week: Monday – Thursday, 6:00 AM – 4:00 PM, Friday; 6:00 AM – 3:00 PM; and Compressed Week: Monday – Thursday, 6:00 AM – 4:00 PM.

Network Operations (SC1B) will schedule employees for downtime, routine maintenance, upgrades, installations, etc., as required

(typically the third Sunday of each month) to minimize disruption to the 81 to Training Wing and customers.

The actual effectiveness of the MEO plan to use the SC1B employees for the purpose of cross-utilization within the SC1B section as well as to provide "back-office" support the SC1A Help Desk section is seriously flawed due the following factor: Exhibit II-AB: SC1B Back-Office Support to SC1A Help Desk shows the MEO plan to provide back-office support to the Help Desk as found in the third paragraph on page 3-18 of the MEO Management Plan Part 3 **(Attachment II-B)**. It is not reasonable that this can be accomplished.

**<u>Exhibit II-AB:</u>**

**SC1B Back-Office Support to SC1A Help Desk**

Network Operations (SC1B) and Base Communications Services (SC1C) will provide assistance, back-office support, and training as required to Help Desk personnel.

The MEO fails to justify or explain how or why workers throughout the NCC work sections will provide backup for each other's duties in case of absences, and other similar instances. Under the MEO's proposed SC1B staffing effective cross-utilization is not possible. This is largely due to the MEO's huge under-estimation of the work to be accomplished, the time frames in which they need to be accomplished, and the performance standards which must be met. The MEO does not provide sufficient justification, training or cross-utilization strategy to accomplish the required workload. The MEO fails to present effective innovative methods or strategies that justify how the massive amount of hands-on full administration, operations and maintenance of all resources under the NCC will be accomplished by their proposed staffing. Cross-utilization capacity of employees are further complicated if the MEO intended to use the IA/COMSEC personnel, the web developer, or the supervisor as back up to other duty stations within the section or outside of the SC1B section.

The two IA/COMSEC personnel that the MEO has assigned to the Network Operations section will be totally immersed in their duties. It is RKR's experience at AETC and AFRC bases where it staffs these IA/COMSEC functions that the IA/COMSEC employees will be extremely busy if not overworked. As a result, they will not be able to provide any other support to the network operations section in a cross utilization manner. In addition, this is an area where a conflict of interest is also a concern. Specifically, IA personnel, as part their duties, must perform regular assessments and inspections on the COMSEC User Account within the Network Operations area. As they report to the Network Services Branch Manager, who is

ultimately responsible for the operation of classified systems, their objectivity will be compromised. These personnel should be in a separate area and report only to the MEO Chief.

Another shortcoming is that the MEO staffed only one web developer. It is unreasonable to expect one person to perform all the training for unit web developers, monitor over 12,000 web pages from 48 different sites for functionality on both the public and restricted web servers, review all pages submitted for proper content and format, and have any time off at all throughout the year. The MEO bid of this function as a one deep position which is not staffed sufficiently to meet the PRD requirements is unreasonable. Furthermore, the MEO does not provide sufficient justification on how innovative approaches or improved/automated processes will aid in accomplishing these duties with just one person. At the minimum, the single staff member that the MEO bid for this function could not reasonably be counted on to support or backup workers in other duties within SC1B or other sections, as the MEO proposal reflects.

As presented in the two previous paragraphs, the MEO cannot utilize the two Information Assurance (IA) personnel or the single web developer for the purposes of cross-utilization or backup of duties. The SC1B supervisor can only reasonably be counted on about half the time to perform in a back-up capacity to any other functions. As demonstrated in Exhibit II-AA: SC1B Hours of Operation, the MEO scheduled one (1) employee for the swing shift. Combined with all the other workload requirements argued herein, this effectively leaves 5.5 FTEs available for the cross-utilization resource pool. But the 5.5 employees available for the cross-utilization pool are further limited by the constraints of the MEO's Compressed Work Schedule. Specifically, fewer employees will be available for the cross-utilization pool each Friday. This is a serious shortfall because the MEO identified in its Management plan its dependence on using the SC1B personnel to provide "back office" support to the Help Desk (SC1A ). The MEO clearly over-burdened a staff that is already insufficient in numbers to perform the functions inherent within the SC1B section, but also to attempt to provide critical assistance support to the Help Desk. This is clearly unreasonable and further forms the nexus for complete mission failure within the SC1 branch.

The MEO Operational Audit did not account for providing "back office" support to the SC1A Help Desk or cross-utilization of the functions the MEO claims will be performed. The MEO Operational Audit also did not account for the SC1B Chief to act as primary back-up to the SC1 MEO Chief. The insufficient manning in this section brings forth unacceptable mission risk and imminent mission failure because other SC1 sections and in fact the entire Keesler customer base of 10,000 rely on the services that the SC1B is expected to deliver. The SC1B is insufficiently staffed to perform their PRD requirements and cannot be counted on to assist, train, or back up employees in other MEO responsible areas.

In summary, the MEO should not be certified because, either:

1. If the MEO did NOT bid a NOSC centric environment but did actually bid the PRD requirements, then the MEO's bid is entirely unrealistic, unsupportable by the facts, and the MEO SC1B staff will not be capable of accomplishing the mission as set forth in the PRD. Exhibit II-X shows that the MEO unrealistically dedicated only six (6) employees to handle the PRD Network Control Center requirements which were previously staffed by sixty-four (64) personnel. The actual manpower reduction of the Core Network Services of the NCC functions is actually 89.3%. The MEO and the Air Force Appeal Team have the unreasonable belief that two (2) incumbent GS employees along with four (4) non-incumbent GS employees can effectively perform all of the NCC requirements that were previously performed by one (1) Air Force Officer, sixty-five (65) Enlisted Personnel, and three (3) incumbent GS employees. This assumption made by the MEO and supported by the Air Force Appeal team is totally unreasonable and should not have been certified; or,

2. The MEO incorrectly bid the NOSC centric environment that clearly does not meet the requirements of the PRD, and, therefore, additional personnel must be added to the MEO staff. Consequently, the MEO proposal should not have been certified.

Under either scenario, RKR must prevail with its protest.

## III. THE MEO USED THE INCORRECT GRADE LEVELS FOR STAFFING THE QUALITY ASSURANCE EVALUATOR (QAE) FUNCTION FOR THE MEO SUBCONTRACTS.

The MEO used a GS-9 and GS-11 Quality Control inspectors for the MEO subcontract when they should have used a GS-11 and GS-12, as required by A-76 Procedures.

The following is from the LBOSRationale.doc, page 3 top of page. See **Attachment III-A:**

> Also included in this area are the FTEs necessary to perform contract administration. DoD 4100.XX-M, dated 14 Mar 2001, guidance indicates that this study type constitutes a combination of in-house labor and subcontracts which requires the MEO to include the cost necessary to perform inspections and surveillance.

> The number of FTEs is derived from win COMPARE[2] Line 3E – MEO Subcontractor Cost are only the FTEs necessary to perform inspection and surveillance for the MEO subcontracts, not the entire MEO. The number is based upon the number of contract administration costs for MEO subcontract contract man-year equivalents (CMEs) using the above DoD guidance, Chapter 8, Figure C8.F1 to determine number and grade of positions added.

This reference was used to determine number and grade of positions. Proper application of this logic results in staffing one GS 12 grade and one GS 11 grade as QAEs. The MEO however priced one GS 11 and one GS 9.

The difference in cost between the foregoing staffing is a simple calculation of the difference in cost between the required GS 12 and GS 11 and MEO proposal of the GS 11 and GS 9. RKR Exhibit IIIA shows the total increase that should be applied to the MEO IHCE in order to staff the QAE function with the proper grade levels.

**Exhibit IIIA: Incorrect QAE Rate Calculation**

| Period | GS-12 | | GS-9 |
|---|---|---|---|
| 1 | $23,488.74 | | |
| 2 | 96,079.74 | | $66,254.17 |
| 3 | 100,392.44 | | 69,228.10 |
| 4 | 104,319.92 | | 71,936.00 |
| 5 | 108,701.36 | | 74,957.00 |
| 6 | 113,266.81 | | 78,105.00 |
| 7 | 118,350.98 | | 81,611.00 |
| 8 | 122,981.03 | | 84,804.00 |
| 9 | 128,146.23 | | 88,366.00 |
| 10 | 133,528.37 | | 92,077.00 |
| 11 | 139,522.02 | | 96,210.00 |
| | | | |
| | $1,188,777.64 | | 803,548.27 |
| | | | |
| | Difference | | 385,229.37 |
| | | | |
| | Overhead | 11.9966% | 46,214.48 |
| | | | |
| | Total Increase | | $431,443.85 |

The MEO proposal will not fulfill the requirements of the PRD. The MEO is utilizing a subcontract. As a consequence, they are charged with the personnel cost pursuant to the DOD Costing Manual, which they failed to do. When they priced this requirement, they correctly priced 2 FTE's, but they did it incorrectly in pricing at a lower pay grade than required. One GS-11 and one GS-9 were priced, as opposed to the required one GS 12 and one GS 11. The Costing Manual is clear that when 28 CME's are under subcontract, as is the case with the Multi Media Contract, which is part of the Little BOS, the correct staffing is one GS-12 and one GS-11. As will be detailed in item 4 below, the MEO planned the two QAEs for their own Quality Control functions. However, when the MEO computed this same factor against the private sector bidder, they did so by pricing higher-level, more expensive Contract Administrators (QAEs). The costs associated with these personnel are charged against the private sector offeror. In this instance, they correctly priced three Contract Administrators (QAEs) as 1 each GS-12, 1 each GS-11 and 1 each GS-9 against RKR in line 8 of the Cost Comparison Form, but that resulted in an improper price comparison.

**THE AGENCY APPEAL RESPONSE** (Attachment 1-C, page2):

> The actual positions included in the cost comparison found that SC1 was staffed with 12 positions. Two additional positions with the grade structure of GS-12 and GS-11 representing the QAE requirements were included under "Keesler AFB MS" as positions 6001 and 6002. The backup personnel cost spreadsheet that cross-walks to the data entries for the cost comparison (personnel Line 1) referenced the 6001 and 6002 positions as the QAE positions. Therefore, the grade structure for staffing the QAE function for the MEO: subcontracts is consistent with A-76 policy.

The Appeal Authority agreed that that the Grade structure for the two QAE's required for the MEO subcontract should be a GS 12 and a GS 11, but they confused the contract administration positions (line 8 on the CCF) with QAE's for the MEO subcontract. The Positions, 6001 and 6002 (Attachment 3a File Name: "Copy of line 1_LBOS Personnel Worksheet.xls" on Worksheet name "LBOS Personnel Worksheet") marked as Keesler AFB MS are the QAE's that are to be added to the contractor's price on line 8 of the CCF. They are not the QAE's for the MEO subcontract which RKR appealed. The QAE's for the MEO subcontract are positions 1002 (GS11) and 1003 (GS-9). See **Attachment III-B**. They are both listed under function SC1. They are both Visual Information Specialist which is consistent with the requirement for QAE's for a visual information subcontract. The MEO has no other Visual Information function other than monitoring the multimedia subcontract. They are listed on page 7 of the MEO quality control manual (See **Attachment III-C** File name "LBOS-qc.pdf") as quality

control for the subcontract. Paragraph 3.2.1.3 (**Attachment III-D** Page 7-10 of the MEO Management Plan Part 3 File Name "LB_Management Plan_Part3.PDF") lists monitoring the Multimedia subcontract as a function performed by SC1 (Projects Support not section "Keesler AFB MS." Therefore, RKR's argument that the pay grades should be raised to GS-12 and GS 11 should be approved. To do otherwise would be unreasonable and the MEO should not have been certified.

## IV. THE MEO FAILED TO PROVIDE THE MANPOWER TO PERFORM THE DUTIES OF PRODUCING THE REPORTS REQUIRED BY THE PRD LISTED IN APPENDICES 7.C AND 8.C AND TO ADEQUATELY PERFORM QUALITY CONTROL MANAGEMENT FUNCTIONS.

The Operational Audit Manpower study summary (**Attachment II-B**,) indicated that 10.3939 FTE were required to accomplish the SC1 functions exclusive of the two (2) QAE positions (for the Multimedia Contract). The total SC1 manning was rounded down to 10 plus the 2 QAE positions. Note that the A-76 Costing Manual (**Attachment IV-A**) directs the following calculation in regards to FTE rounding:

C0.15.3. Full Time Equivalents (FTE) are rounded to the third decimal place

This shows a shortfall of 0.4 FTE using the MEO's own Operational Audit summary data. Based on the duties listed for the QAEs and the 0.4 FTE shortfall, the MEO was clearly planning on using the "spare" time of the assigned QAEs to satisfy a large part of the total quality control management manning requirement, which is unreasonable. The responsibilities of the QAEs as listed in the MEO Quality Control Plan are provided in the Table below as extracted form **Attachment III-C**.

| WHO | Responsibility and Authority |
| --- | --- |
| Quality Assurance Personnel (QA) | • Monitor MEO subcontractor performance.<br>• Verify processes and work outputs.<br>• Collect, analyze, and report quality and performance management data/metrics.<br>• Report deficiencies to the MEO Chief and Contracting Officer |

All of these functions except, "Monitor MEO subcontractor performance" are related to the MEO's quality control and performance management function which can not be performed by the QAEs who are expressly dedicated to the QAE functional oversight of the MEO subcontracts and are not MEO contract Quality Control Managers.

The MEO **must** allocate the cost of the two QAEs **fully** to subcontract oversight, which they did not. That is their current full time function and the MEO has given no rationale as to how these 2 positions have any available time to devote to the Quality Control function of the MEO. The DOD Costing Manual precludes these positions from being used elsewhere in the MEO. The MEO agrees with this assessment by stating as much in their LBOS Rational document at page 3 where they state (see **Attachment IV-B**, page 3):

> The number of FTEs is derived from winCOMPARE Line 3E – MEO Subcontractor Cost are only the FTEs necessary to perform inspections and surveillance for the MEO subcontracts, *not the entire MEO. (Emphasis added)*

It is ironic that the MEO acknowledges this fact in their rationale yet then proceeds to use these same individuals for the Quality Control functions for the entire MEO in their Quality Control Plan in direct contradiction of the earlier statement in their rationale volume. Eliminating the QAEs from the performance of contract quality control management functions will create an added shortfall of .75 FTE in quality control management. This totally wrong assessment of work load accomplishment is unreasonable and must be rejected.

The MEO Management plan incorrectly fails to assign manning for the function of collecting the data, analyzing the data, or creating the reports listed in the PRD, Appendix C, Table 7.C. "*Required Reports*" **(Attachment IV-C)** This PRD item is normally accomplished, monitored and supported as part of the quality control program. This function typically would require at least 0.25 FTE to accomplish. These factors add to a QC management shortfall of 1.4 FTE. The MEO needs to provide at least one dedicated management level Quality Control Manager to accomplish these requirements. Normal practice as set out in ISO 9001-2000 (which the MEO purports to utilize) requires a management level quality representative (quality control manager) to be appointed by top management (the MEO Chief) to represent management and report to top management on the performance of the QMS and to insure the promotion of awareness of customer requirements throughout the organization. For an operation the size and complexity of the Keesler AFB communications effort, an independent quality control effort is required. It would not be an acceptable "good practice" for the Project Manager and the QCM to be the same person.

In summary, RKR Exhibit IVA summarizes the QC manning shortfall as a result of the issues presented above and reflects the price of the additional cost of the Quality Control staffing which should be added to the MEO IHCE.

**Exhibit IVA.**

| MEO QC Management Manning Shortfall | |
|---|---|
| SCI OA Rounding Down | .4 FTE |
| Quality Control Manager | .75 FTE |
| Report Production and Monitoring | .25 |
| Total Quality MEO Shortfall | 1.4 FTE |

**Exhibit IVB:**

**Additional 1.4 Quality Management Personnel**

| | Period | Cost |
|---|---|---|
| | 1 | $20,674.29 |
| | 2 | 80,165.58 |
| | 3 | 83,763.95 |
| | 4 | 87,040.90 |
| | 5 | 90,696.62 |
| | 6 | 94,505.88 |
| | 7 | 98,747.93 |
| | 8 | 102,611.08 |
| | 9 | 106,920.75 |
| | 10 | 111,411.42 |
| | 11 | 116,412.31 |
| | | |
| | | 992,950.71 |
| Overhead | 11.9966% | 119,120.46 |
| | Per FTE | 1,112,071.17 |
| | 1.4 FTE's | $1,556,899.64 |

**THE AGENCY APPEAL RESPONSE** (Attachment I-C, page 3) to the foregoing was:

> **Discussion:** Appellant alleges two errors committed by the MEO: a) the SCI. requirement should be rounded up to 10.4 and, b) the manpower provided is inadequate to perform quality control functions.
>
> a. Mapping the MEO Management Plan to the actual entries on Line I of the MEO cost estimate is sometimes challenging. However, analysis of the cost comparison data found 12 positions to include the MEO Manager assigned to SCI when the operational audit calculated 10.394 required. Additionally, scheduled overtime hours were included as other pay for three GS-09 positions.

> Therefore, the 10.394 staffing requirement was increased to 11 positions, the WO manager position was added to increase the SCI staffing total to 12 positions, and an additional allowance factor at management's discretion was included as scheduled overtime thereby exceeding the operational audit minimum staffing calculations for SCI. As a result, the submitted allegation is not supportable when the actual staffing included in the cost comparison is examined.
>
> b. The second issue is whether the Quality Control (QC) Plan is effective at performing the requirements in the PRD. A side issue is whether the MEO planned on utilizing subcontract QAEs to perform the internal QC work for the entire MEO. According to the MEO Quality Control Plan, "the MEO Chief has executive responsibility for the development and maintenance of the quality system, overseeing the day-to-day operations for the quality system, and interacting directly with the government on quality and performance management issues. Primary responsibility for implementing the quality system resides with the functional area supervisors. The supervisors ensure that documented procedures define the specific responsibilities, authorities, and relationships of personnel who manage, perform, or verify work that affects quality." The QC Plan provides that QAEs will monitor subcontractor performance. Additionally, our examination of documents did not provide evidence the QAEs were being used for other than QAE purpose. In summary, the PRD does not require a separate QC organization and the QC Plan provided by the MEO is sufficient.

Nothing in any of the documents provided by the MEO considers the time or the personnel needed to provide the required reports as specified in the PRD, thus, the Agency Appeal response has no basis. Although the MEO Chief is shown to be responsible for the MEO quality plan, the MEO quality plan does not include the generation of the required reports in the PRD. The MEO has completely left out the requirement for report generation. Accomplishing the generation of these reports will require additional staffing for their accomplishment as RKR has argued herein.

The QAE's were doing functions as listed in the MEO quality control plan on page 7 (**Attachment III-C**) that were other than quality surveillance of the Multimedia subcontractor. The Appeal authority incorrectly stated that they did not find that the QAE's were being used for other purposes when, in fact, the QAE's were also being used for accomplishing inventories, as noted in LBOS Attachment 8A_Transition_Plan.pdf,

page 8A-3. See **Attachment IV-D.** Additionally, in paragraph 3.2.1.10 (**Attachment IV-E** MEO Management Plan Part 3 File Name "LB_Management Plan_Part3.PDF) of the MEO management plan it is shown that the senior multimedia QAE is being used as the facility manager for building 902. That is not a reasonably possible tasking.

The staffing for SC1 is 12 FTE's including the two subcontract QAE's. This leaves only 10 FTE's to perform the functions listed in the MEO's operational audit for 10.394 FTE's. The Appeal Authority claimed that the additional overtime made up for the fact that the 10.395 FTE's was rounded down to 10 this, however, this is not backed up by anything in the MEO Management Plan. The Costing Manual requirement indicates the rounding down should not have occurred which leaves a shortfall of 0.4 FTE using the MEO's own Operational Audit summary data. This violation requires them to add these personnel back into their calculations.

The overtime for all three GS-9's together only amounts to .3096 FTE's or an effective staffing of 10.31 FTE's. The .3096 Overtime FTE's are listed in the "Other Pay worksheet." See **Attachment IV-G.** What is not clear is if the Operational Audit calculated 10.394 FTE's plus the overtime or 10.394 FTE's including the overtime. RKR requested a copy of the Operational Audit documentation including the positions reviewed during the appeal period but the request was denied (see **Attachment IV-F**, e-mail dated Tuesday, August 23, 2005). The Operational Audit analysis for this function would have established the functions performed and/or those that were eliminated from the manning calculations.

**V. THE MEO TRAINING DOLLARS ALLOCATED ARE NOT CONSISTENT WITH REQUIREMENTS OF THE PRD OR REALITY. CORRECTION OF THIS ISSUE WILL ADJUST THE MEO IHCE IN THIS AREA TO REFLECT AN INCREASE OF APPROXIMATELY $398,960.**

As stated previously herein, the MEO is not in compliance with the PRD in respect to addressing the staffing in the Network SC1B function. The MEO clearly staffed to provide "touch labor" instead of the full services needed to meet the PRD requirements, as shown in the MEO's Management Plan where they state, "Network Operations, guided by the AETC NOSC, will provide "touch-maintenance".

The MEO's failure to recognize the actual requirements and failure to staff for the actual requirements also plays a large role in their failure to properly apply the necessary training costs in order to maintain competency and proficiency for their communications and information technology employees. The RFP was specific in its instructions.

From the RFP Section M-901(**Attachment V-A**, M-4, M-5):

b. EVALUATION PROCEDURES FOR MISSION CAPABILITY

(3) Description of Factors and Subfactors

(iv) Subfactor: Program Management & Staffing

Description of Subfactor: Under this subfactor the offeror's proposal will be evaluated for its approach for structuring and staffing key personnel to effectively accomplish the work under this contract. The Government will evaluate the offeror's approaches for effectively planning, controlling, directing, and accomplishing the services under this contract. The subfactor is met when:

(d) The offeror's proposal clearly defines a plan for ***recruiting, training, qualifying, and certifying employees to sustain a qualified workforce throughout the life of the contract.*** *(Emphasis added)*

The MEO failed to offer a plan to satisfy the requirements of Section M-901 and as such the certification of the MEO is unreasonable. In fact their spreadsheet, LBOS Transition Plan (contained in the MS Excel file; Line 1_LBOS Personnel Cost, page 27-29) indicates minimum training and **no** certifications for **any** personnel. See **Attachment V-B.**

The MEO also notes in its Management Plan that it plans on cross utilizing personnel, yet offers little or no training. It is not reasonably possible that an individual can be cross utilized in these highly technical and differing work functions without proper training in that additional work function. The MEO also states in its cost rationale volume that their training cost may be artificially high when in reality they don't have to provide it (training). There is no justification for why the Government doesn't think they have to provide training because the PRD specifically requires this training. This is provided at Line 3G-Training Cost Backup (**Attachment V-C**)

| | | | |
|---|---|---|---|
| Total spent on local training | | $50,465.99 | |
| Total Serviced Population | | 1513 | FQ 03/4 UMD |
| | | | |
| Cost per Person | | $33.35 | |

This data was provided by the civilian training manager and represents FY03 actual expenditures.

In the Other Training tab, we did include the two costs where the location is marked as Keesler/Gulfport since it represents the base paying for the instructor to come here or for someone to go to Gulfport.

> The training cost may seem low because it does not include:
> Training provided off-site (which is costed under TDY's)
> Training taken electronically through free government sites (not costed since its free)
> Training provided as part of equipment acquisition (which is costed as part of the acquisition cost)
>
> *However, this cost may actually be artificially high because it assumes ALL training is required, when in reality the MEO is not obligated to provide it.*_(emphasis added)

Stating that the MEO does not have to meet the requirements of the PRD is reason enough to state that the certification of the MEO was unreasonable. The PRD as well as the OMB Circular A-76 Revised Supplemental Handbook requires the MEO to comply with the requirements of the PRD.

The fact that the MEO should have priced their training cost to provide and maintain a competent staff in the NCC was raised during the appeal process. The response given by the Agency Appeal Authority the Administrative Appeal was (**Attachment I-C**, page 4):

> The proposed MEO will be made up of *all civilian fully-qualified, incumbent workforce* at the start of contract service. Obviously, these employees would not require the same amount of training as a completely new workforce. The resultant training cost estimate may seem low to a private sector provider; however, the methodology used to determine the training cost is *sound and rational*. (emphasis added)
>
> Such a methodology was not reasonable.

The Agency Appeal Authority response that the proposed MEO will be made up of an all civilian fully qualified incumbent workforce at the start of the contract is unsupportable and wrong. In fact, in the Network Operations Center there are only 3 current civilian "incumbent" workers, of which 2 are part of the MEO. The remaining 66 current workers are military. Reference RKR Exhibit V-A. A similar situation exists in the Help Desk/Material Control area where there are currently no civilian incumbent workers. Military personnel receive their training as part of their normal career progression, tech schools and the like. There is no justification for a highly trained incumbent civilian workforce. This makes the statement that "obviously, these employees would not require the same amount of training as completely new workforce inaccurate as well. This is an area where technology is always changing and training is vitally important. The rationale made by the Appeal Authority is simply unreasonable. The chart below (RKR Exhibit V-A) is an RKR generated summary of the personnel data on

pages 4-1 through 4-3 of the MEO Management Plan (reference **Attachment V-D**) and is not supportive of a no cost training requirement.

**Exhibit V-A**

| | Current Military | Current Civilian | MEO Proposed | Required New Hires | % New Hires |
|---|---|---|---|---|---|
| **Project Support SC1** | 13 | 8 | 12 | 4 | 33.33% |
| **Help Desk/Job/ Material Control** | 10 | 0 | 7 | 7 | 100.00% |
| **Network Operations** | 66 | 2 | 10 | 8 | 70.00% |
| **Base Communication Services** | 30 | 9 | 13 | 4 | 30.77% |
| Total Each Category | 119 | 20 | 42 | 22 | 52.38% |

In the MEO rationale they state that they had an inability to obtain training cost from Resource Advisors, and they used FY03 total civilian training budget for Keesler as a baseline. Any proposal from a private-sector company making such a statement would have not been found as compliant with the requirements of the PRD and thrown out as being technically unacceptable. RKR had to do the appropriate research to come up with training cost but the MEO was allowed to profess an unsubstantiated cost of $16.67 per person, which should have been at least $33.35, as shown in **Attachment V-C**. They state that other training costs are captured as part of TDY's. But the unreasonableness of the $16.67 figure is reflected in the MEO's claim that this is only local cost and does not include travel cost for training. The "local" training by the MEO's own admission only represents 25% of the actual training cost. The MEO stated that these "other" training costs are captured as part of the TDYs, which is priced under CLIN X005 as a "not to exceed" price, which was considered a "wash" cost and not used in the cost comparison. The error is that CLIN X005 is for Travel cost only. It is not for the actual cost of the training, only the travel and perdiem cost "associated" with the training. They also state that some training is funded as part of an equipment purchase. Then they state that much of the training is provided to employees through on-line training sources free to all government employees. None of these assertions is reasonable nor can it nor was it

justified with factual support. The MEO must price all the actual costs of training, which it did not do to the tune of at least **$398,960.**

The MEO claims the electronic Government CBT are free, which they are not. Someone had to pay for them at some time. They have some cost to the government and should be added to the MEO cost.

But additionally, the NCC technician's major training requirement is not from CBT trainings. It is the training that goes with operating an NCC which requires professional certifications associated with Microsoft, Cisco, and UNIX. The same logic that applies to the switch maintenance technicians applies to the network support professionals. For example, to upgrade the technical capabilities of a switch technician, class tuition ranges from $990.00 to as much as $7900.00 for a single MSL-100-related course. Associated with this training are TDYs at the Nortel training site in Raleigh NC, which currently has a per diem rate of $127.00 per day. None of this is addressed in the MEO nor did the Agency Appeal Authority require any support for it.

**Exhibit V-B**

These are some samples from the MEO's Cost Support Data. See **Attachment** V-E):

| Training | Vendor | Cost |
|---|---|---|
| BUS 3180 Human Resource Management | William Carey College | $345.00 |
| BUS 3130 Business Communications | William Carey College | $345.00 |
| PSY 3510 Introduction/Psychological Statistics | William Carey College | $460.00 |
| BUS 340 Principles of Real Estate | William Carey College | $345.00 |
| Best Value Source Selection Using Trade-offs | Management Concepts | $6,075.00 |

| | | |
|---|---|---|
| BUS 4140 Small Business Management | William Carey College | $345.00 |
| ENG 150 (Essentials of Grammar/Writing Lab | William Carey College | $345.00 |
| Planning & Conducting a RIF | USDA | $695.00 |
| Trigonometry | MGCC | $2,348.05 |
| CPF Personnel English & Grammar | Florida Center For Training | $1,992.05 |

These are just a few samples taken from the Cost Support Data. Please reference Exhibit V-E for a complete listing of their cost support for training. The training needed for these positions is complex. Trigonometry, English and RIF classes cannot possibly be considered as sound and rational training. These types of training are typical for a mostly military organization.

The expectation that any workforce will be able to maintain their technological competency over eleven years using primarily the skills they were hired with is ill-conceived and unreasonable for the communications and information technology fields and it cannot be done in any reasonable environment. These two fields are perhaps the fastest evolving fields in modern day business. There are ever changing technological advances in equipment and operating systems on a monthly basis. The Air Force, and especially AETC, is relentless in pursuing improvements and efficiencies through upgrading their communications and information technology infrastructures. The real life prospect of maintaining the level of competency and training needed to staff a "full service" Comm & IT workforce over an 11 year period with the training dollars the MEO provided is simply not realistic.

The PRD and the A-76 handbook is clear that the MEO must comply with the provisions of the PRD so that the bidding is on a level playing field.

The MEO did not meet the requirements of the PRD and therefore, the MEO should not have been certified. As stated in RKR's appeal (**Attachment V-F**) the MEO effort is at least $398,960 less than required. This is shown in the chart below:

| | | Cost Per Person | Number of Employees | Total Yr 1 |
|---|---|---|---|---|
| | Switch Training | $15,000 | 1 Unit | $15,000 |
| | NCC Training | $1,000 | 10 | $10,000 |
| | Other Employees | $300 | 30 | $9,000 |
| | | | Total | $34,000 |

| Period | Training Required | MEO Bid SC1A | MEO Bid SC1B | MEO Bid SC1 | MEO Bid SC1C | Total MEO Training Proposed | Difference |
|---|---|---|---|---|---|---|---|
| 1 | $34,000.00 | $55.24 | $69.20 | $103.01 | $84.41 | $311.86 | $33,688.14 |
| 2 | 34,714.00 | 251.21 | 358.88 | 430.65 | 465.54 | 1,506.28 | 33,207.72 |
| 3 | 35,442.99 | 256.49 | 366.41 | 439.7 | 476.34 | 1,538.94 | 33,904.05 |
| 4 | 36,187.30 | 261.88 | 374.11 | 448.93 | 486.34 | 1,571.26 | 34,616.04 |
| 5 | 36,947.23 | 267.38 | 381.97 | 458.36 | 496.55 | 1,604.26 | 35,342.97 |
| 6 | 37,723.12 | 272.99 | 389.99 | 467.98 | 506.98 | 1,637.94 | 36,085.18 |
| 7 | 38,515.31 | 278.72 | 398.18 | 477.81 | 517.63 | 1,672.34 | 36,842.97 |
| 8 | 39,324.13 | 284.58 | 406.54 | 487.85 | 528.50 | 1,707.47 | 37,616.66 |
| 9 | 40,149.94 | 290.55 | 415.08 | 498.09 | 539.60 | 1,743.32 | 38,406.62 |
| 10 | 40,993.08 | 296.65 | 423.79 | 508.55 | 550.93 | 1,779.92 | 39,213.16 |
| 11 | $41,853.94 | $302.88 | $432.69 | $519.23 | $562.50 | 1,817.30 | 40,036.64 |
| | | | | | | $16,890.89 | $398,960.15 |

## SUMMARY

The factors and goals that played major roles in RKR's development of its proposal for the Keesler Little BOS were:

1. Full comprehension of the solicitation.
2. Full compliance with all requirements.
3. Realistic staffing based on the workload identified in the RFP.

4. Our commitment to meet and exceed the expectations of our customer.

All of these factors are driving forces to the issues RKR has presented in this document. Item 4 is especially relevant in that RKR's approach to the entire proposal was geared to fully meet and exceed the RFP statement of expectations found in paragraph 1.5 of the Summary of Expectations (Attachment II-L).

> *1.5. STATEMENT OF EXPECTATIONS: We expect the service provider to provide*
> *services that effectively support military readiness, military operations, Keesler's training mission, and Keesler's tenants. Keesler expects the service provider to support*
> *hospitable, safe and reliable living and working environment. Using "best practice"*
> *expertise, the service provider is expected to provide fast, flexible, customer focused*
> *services that achieve consistent quality and continuous improvements in efficiency.*

The MEO was clearly not compliant with key portions of the RFP. The MEO failed to recognize the key work drivers presented in the RFP in regards to the network section. Furthermore, the MEO did not apply "best practice" expertise in staffing the inherent core services which are critical to supporting the Keesler AFB communications and information backbone.

In addition the MEO's Management Plan failed to comply with the provisions of sections L and M of the RFP. RKR has not listed each and every instance where there is a material failure in compliance simply because to do so would require a complete rewrite of the MEO's TTP. However, a rudimentary evaluation of the PRD requirements shows the MEO failed to meet most of the requirements and as such RKR challenges the certification process.

Exhibit 6-1 summarizes the total cost impact of the items presented in this Protest. This exhibit also shows projected adjusted costs made to the MEO IHCE and the RKR contract prices if all issues are ruled in favor of RKR.

Exhibit 6-1
Summarized Cost Effect

| | | | Effects to MEO IHCE and RKR Contract Price | |
|---|---|---|---|---|
| Exhibit Reference | Description | Amount | MEO IHCE | RKR Contract Price |
| Exhibit I-A | Increased Tax Credit | ($1,518,896) | | ($1,518,896) |
| | | | | |
| Exhibit II-N | Network Operation Function Additional 16.53 people | 17,606,437 | 17,606,437 | |
| Exhibit III-A | Incorrect QAE Rate Calculation | 431,444 | 431,444 | |
| Exhibit IV-B | Additional 1.4 Quality Managers | 1,556,900 | 1,556,900 | |
| | Subtotal Personnel Additions | 19,594,781 | | |
| | Increase conversion differential 10% of increased MEO personnel cost ( from CCF Line 1) | (1,749,587) | (1,749,587) | |
| | | | | |
| Exhibit V-C | Additional Training Cost | 398,960 | 398,960 | |
| | | | | |
| | Total Impact | | 18,244,154 | ($1,518,896) |
| | Figure From CCF Line 15 Adjusted Total Cost of In-House Performance | 54,719,167 | | |
| | Total Increase to MEO IHCE | 18,244,154 | | |
| | Adjusted Total Cost of MEO IHCE | 72,963,321 | | |
| | | | | |
| | Figure From CCF Line 16 Adjusted Total Cost of Contract or ISSA Performance | 59,691,967 | | |

| | | | | |
|---|---|---|---|---|
| | Total Decrease to RKR Cost | (1,518,896) | | |
| | Adjusted Total RKR Cost | 58,173,071 | | |
| | | | | |
| | Difference in IHCE vs RKR cost is in favor of RKR. | ($14,798,250) | | |

## CONCLUSION

The costs associated with meeting all of the PRD requirements when added to the MEO IHCE make it clear that RKR is the lower bid and RKR should be awarded the contract.

## RELIEF REQUESTED

RKR requests that the GAO grant the Protest and that:

(a) the contract be awarded to RKR; and,

(b) costs of pursuing this protest, including attorney fees, be awarded to RKR.

Respectfully Submitted,
THE GARDNER LAW FIRM

David F. Barton

Enclosure:

REQUEST FOR DOCUMENTS

List of Exhibits:

1. **Exhibit I-A:** Income Tax Credit
2. **Exhibit II-A:** PRD History
3. **Exhibit II-B:** Extracted from the MEO's Management Plan Paragraphs 3.2.2.13
4. **Exhibit II-C:** Extracted from Paragraph 3.2.3.5 (Concept of Operations)
5. **Exhibit II-D:** Extracted from the fourth paragraph of "3.2.3.5.1, Normal Operations"
6. **Exhibit II-E:** Individual Duties
7. **Exhibit II-F:** RFP Extract of Section 7.4 of the PRD (Attachment II-G)
8. **Exhibit II-G:** Service Delivery Summary Extract – item 7 (Attachment II-H)
9. **Exhibit II-H:** Extracted From Little BOS QASP (Attachment II-I)
10. **Exhibit II-I:** Extracted from AFI 33-115V1 (Attachment II-J)
11. **Exhibit II-J:** Workload Drivers
12. **Exhibit II-K:** Daily Effort Required To Review Server Audit Logs for Security and Integrity.
13. **Exhibit II-L:** Extracted from Statement of Expectations (Attachment II-L)
14. **Exhibit II-M:** Air Force Enterprise Network Management Architecture publication (Attachment II-M)

15. **Exhibit II-N:** Cost of Additional Employees for Network Operation Function
16. **Exhibit II-O:** MEO Management Plan Workload Analysis 3.2.3.13
17. **Exhibit II-P:** PRD 7.4.11
18. **Exhibit II-Q:** Opening Paragraph of SC1B Concept of Operations
19. **Exhibit II-R:** Contract Officer Response to Question #T-07-046
20. **Exhibit II-S:** Administrative Appeal Response to Item #5
21. **Exhibit II-T:** Original Staffing for Network Operations
22. **Exhibit II-U:** MEO SC1B Section
23. **Exhibit II-V:** MEO Analysis of Resources Impact
24. **Exhibit II-W:** Unreasonable MEO Manpower Reductions as compiled by RKR.
25. **Exhibit II-X:** Functions Consolidated Into the MEO SC1B Section
26. **Exhibit II-Y:** Unusual Duty Hours From 7.4.10
27. **Exhibit II-Z:** MEO Unusual Duty Hours Shortfall
28. **Exhibit II-AA:** SC1B Hours of Operation
29. **Exhibit II-AB:** SC1B Back-Office Support to SC1A Help Desk
30. **Exhibit III-A:** Incorrect QAE Rate Calculation
31. **Exhibit IV-A:** MEO QC Management Manning Shortfall
32. **Exhibit IV-B:** Additional 1.4 Quality Management Personnel
33. **Exhibit VI-A:** Summarized Cost Effect

Copy to:

Contracting Officer:

Ron A. Mortag
AETC Contracting Squadron/LGCK
2021 First Street West
Randolph AFB, TX 78150-4302

Copy to be sent to contracting officer within the next business day.