**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| RKR JOINT VENTURE, LLC<br>A Mississippi Limited Liability Corporation,<br>Plaintiff, | §<br>§<br>§<br>§ | |
| VS.<br>THE UNITED STATES,<br>UNITED STATES DEPARTMENT<br>OF THE AIR FORCE<br>Defendants. | §<br>§<br>§<br>§<br>§ | NO. 07-CV-00630-MCW<br>Judge Williams |

**MOTION FOR LEAVE TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

TO THE HONORABLE JUDGE OF THE U.S. COURT OF FEDERAL CLAIMS:

Plaintiff RKR JOINT VENTURE, LLC ("RKR") files this its Motion for Leave to Supplement the Administrative Record, and would show as follows:

## I. INTRODUCTION

This motion comes before the Court following a series of teleconferences between the Court and the parties, and subsequent discussions among the parties themselves, regarding (1) Plaintiff's request for preliminary injunctive relief; (2) whether a protective order should apply to the proceeding and to certain documents in particular; and (3) the content of the administrative record in this case.

To date, Plaintiff understands the status of those three foregoing matters to be as follows:

Defendants have agreed on the record not to cancel the solicitation and not to award the contract under that solicitation to the Department of the Air Force's ("DoAF") civilian employee unit bidder, known as the Most Efficient Organization ("MEO"). The duration of Defendants promise is subject to some interpretation, but it remains in effect

at this time. As a result, the Court has not needed to rule on RKR's request for preliminary injunctive relief (Dkt # 5).

A protective order was entered in Dkt # 6. However, following a motion by Plaintiff challenging the applicability of the protective order to certain documents represented by Defendants to constitute part of the Administrative Record, Defendants agreed that the protective order would not apply to those documents. The protective order remains in effect for the case generally.

Defendants have filed and produced what they believe to constitute the Administrative Record in this case (Dkt # 13). Plaintiff maintains that none of the documents proposed by Defendants to constitute the Administrative Record fall within the scope of the protective order.

Plaintiff further hereby responds to Defendants' designation and proposes the exhibits and results of the depositions and document requests listed in Part II for inclusion in the Administrative Record, for the reasons given individually in Part IV.

## II. PROPOSED EXHIBITS AND DEPOSITIONS TO BE TAKEN TO BE INCLUDED IN THE ADMINISTRATIVE RECORD

None of the proposed exhibits contain information that would trigger the protective order in effect in this case (Dkt #6).

Not all of the proposed exhibits are in RKR's possession. Those that are not are known to exist and are held by DoAF because DoAF is the author of the documents. Request is hereby made from Defendants for all proposed exhibits in their possession that are not presently in RKR's possession.

Because the proposed exhibits are voluminous, and several are too large to file electronically, RKR will provide the Court and Defendants with a CD copy. RKR will also provide the Court with a paper copy and will email all of the proposed exhibits in its possession to Defendants' counsel.

The exhibits and depositions proposed by RKR to supplement the Administrative Record are (documents not in RKR's possession denoted by *):

**Tab 17** Circular A-76 (1999 version)

**Tab 18** Circular A-76 (2003 version)

**Tab 19** Air Force Instruction (AFI) 38-203 (July 19, 2001)

**Tab 20** Air Force Instruction (AFI) 33-115
Vol. 1 dated May 24, 2006
Vol. 2 dated Oct. 25, 2006
Vol. 3 dated Apr. 15, 2004

**Tab 21** Air Force Records and Information Management (AFRIMS) Records Disposition Schedule

**Tab 22** Air Force Instruction (AFI) 33-115V1 (July 1999)

**Tab 23** Air Force Doctrine Document 2-8 (June 2007)

**Tab 24** Draft Implementation Plan for AETC Consolidated Help Desk (Nov. 20, 2006)

**Tab 25** Draft Consolidation of Operations Plan for AETC Reengineering and Consolidation of Network and Telephone Operations (Nov. 20, 2006)

**Tab 26** Draft Consolidation of Operations Plan for AETC Reengineering and Consolidation of Network and Telephone Operations (Apr. 24, 2003)

**Tab 27** NCC Reengineering Powerpoint Presentation, Randy Coleman, HQ-USAF (June 3, 2004)

**Tab 28** Joint Expeditionary Force Experiment 2006 Guidebook

**Tab 29** Protecting Our Networks: Joint and Service Perspectives, Powerpoint Presentation, Rob Thomas, Ofc. of Secretary of the Air Force, May 19, 2005

**Tab 30** Prior Unit Manning Documents for Solicitation

**Tab 31** Prior Keesler A-76 Study Functional Spreadsheet

**Tab 32** Organization Charts Prepared by RKR

**Tab 33** Tables Prepared by RKR

**Tab 34** Keesler Air Force Base Administrative Appeal Response, May 29, 2007.

**Tab 35** Barksdale Air Force Base Newspaper, THE BOMBARDIER, Aug. 11, 2006 p.1

**Tab 36** Keesler Air Force Base Administrative Appeal Team Response for Big BOS solicitation, May 17, 2007.

**Tab 37** Keesler News, Aug. 17, 2006 at 1 and 9.

**Tab 38*** Request to Resume Competitive Sourcing Process and Post-Katrina Analysis of Support Service Requirements at Keesler AFB, and all documents responding or commenting on them.

**Tab 39*** Any drafts of Maj. Gen. Lord's Aug. 2 memo and anything else that existed that he might have relied on to know that the solicitation requirements were going to change and by how much.

**Tab 40*** The in-house cost estimate called for by Circular A-76, p. 10 ¶ A.3 (1999)

**Tab 41*** Any annual report to the Office of Management and Budget provided for by Circular A-76, p. 10 ¶ A.4 (1999), explaining why the in house cost estimate called for by Circular A-76, p. 10 ¶ A.3 (1999) was not timely completed.

**Tab 42*** The MEO Operational Audit

**Tab 43*** The MEO Management Plan and Costing Volume

**Tab 44*** Documents relevant to the actual cost comparison or cost evaluation of the MEO's bid, to include:

(i) The final Cost Comparison File bearing the Independent Review Officer (IRO) signature.

(ii) The COMPARE Study File including passwords current as of the date of bid closing.
(iii) The COMPARE Study files including passwords prior to final tax update.
(iv) The COMPARE Study files including password at time of certification by Air Force Audit Agency.
(v) Any and all working papers developed by the Commercial Activities Team that support the MEO and In-House Cost Estimate.
(vi) The interim and final IRO review statements or memoranda identifying problems requiring corrective action (s) and documentation of the implemented corrective action.
(vii) Any and all correspondence with the Air Force Audit Agency concerning this solicitation including the certification of the MEO proposal.

**Tab 45** RKR's Administrative Appeal

**Tab 46*** The Contracting Officer's signed statement of relevant facts, including a best estimate of the contract value, and a memorandum of law. Any documents by the Contracting Officer which set forth findings, actions, and recommendations, and any additional evidence or information not provided in the protest file that may be necessary to determine the merits of the protest; and any list of parties being provided the documents.

**Deposition 1** MR. GARY R. ALLEN and FRCP 30(b)(6) witness/es who provided the background information to Mr. Allen as a basis for the six reasons stated thus far for cancellation of the solicitation

**Deposition 2** MAJOR GENERAL WILLIAM T. LORD and FRCP 30(b)(6) witness/es who provided the background information to him in the preparation of his undated memorandum introduced in the Administrative Record through Mr. Allen's August 2, 2007 cancellation letter.

**Deposition 3** MR. RON MORTAG, Contracting Officer, DoAF

**Deposition 4** MR. RANDY COLEMAN – HQAETC/SCXS

**Deposition 5** LT COL HELEN LENTO – SAF/SCTX

**Deposition 6** BRIG. GEN. PAUL CAPASSO – 81st Tr. Wing, Keesler AFB

**Deposition 7** MAJ. GEN. JOHN W. MALUDA, USAF

III. STANDARD OF REVIEW

A court may consider evidence outside of the administrative record in the following limited situations: (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; ... and (8) in cases where relief is at issue, especially at the preliminary injunction stage. *Protection Strategies, Inc. v. U.S.*, 76 Fed. Cl. 225, 233-234 (2007).

The Court of Federal Claims frequently has adopted and applied these exceptions to the review of outside evidence in bid protest cases. *Id*. The Court has explained:

> [T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision. This is a presumption necessitated by the limited nature of the court's inquiry. As a practical matter, however, in most bid protests, the "administrative record" is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review. This is true in the contract award context if for no other reason than that, due to the absence of a formal record, the agency has to exercise some judgment in furnishing the court with the relevant documents. In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action. It follows that discovery as well as the breadth of the court's review has to be tailored in each case. Whether testimony is needed to frame the issues is likewise dependent on the particular circumstances. Consequently, this court has adopted a flexible approach both in putting together the evidence that will be considered and in discovery, balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as the four corners of the inquiry.

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 349 (1997)

# IV. ANALYSIS

## A. Summary

Based on what Defendants have produced as the Administrative Record in Dkt #13, supplementation is required primarily for the first, second, third and fourth situations outlined in the standard of review above.

The evidence discussed below will enable the Court to understand what was in fact before the DoAF, what it means, and whether any of it was ignored by DoAF in favor of factors supporting the chosen course of action. The evidence will also present facts before DoAF at the time of decision, but not identified by Defendants as part of the Administrative Record, that tend to contradict the explanation given by DoAF.

The parties disagree as to what these essential, underlying facts are. However, the change in the requirements of the solicitation alleged by DoAF is entirely based on staffing levels in only one of the 17 network control center (NCC) subunits of the telecommunications, network, and information technology support program covered by the solicitation. Defendants allege that a proposed reorganization of Air Force Network Operations (AFNetOps) will result in substantial changes to staffing levels in these subunits. RKR notes, however, that AFNetOps is merely a change in command structure and higher level organization that does not substantially affect these NCCs. The change in command is from the Air Education and Training Command Network Operations and Security Center (AETC NOSC) to AFNetOps, but it is a distinction without a substantial difference that was anticipated by the solicitation and does not justify its cancellation, contrary to what DoAF has proposed.

**B. Relationship to Ultimate Issues in the Case**

For the benefit of the Court, RKR applies the standard of review for supplementation of the Administrative Record in the context of the claims pled in its Verified Complaint, Dkt #1.

This Court's jurisdiction over bid protest cases is prescribed by the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Disputes Resolution Act of 1996, Pub.L. No. 104-320, § 12(a), 10 Stat. 3870, 3874-75. Pursuant to that authority, the Court reviews procurement decisions of an agency under the standard of review set forth in the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). See 28 U.S.C. § 1491(b)(4) (2000). The Court's inquiry is thus limited to whether the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Typically, there are two scenarios that may require that the Court set aside an agency's cancellation of a solicitation: (1) the agency's procurement decision lacked a rational basis (i.e., was arbitrary, capricious, or an abuse of discretion); or (2) the procedure employed by the agency violated applicable procurement statutes or regulations (i.e., was not in accordance with law). RKR has pled both grounds in this protest and its arguments for each are interrelated. RKR also has asserted claims on the merits of the bid protest, separate from the cancellation.

*i. "Not in accordance with law"*

Because it is a narrower ground, RKR will address the "not in accordance with law" prong first.

When an agency's cancellation of a solicitation is challenged as "not in accordance with law," the statute or regulation itself provides the test. Cancellation of

DoAF solicitations is governed by FAR 15.206 (48 C.F.R. 15.206), FAR 14.404-1 (48 C.F.R. 14.404-1) and DFAR 214.404-1 (48 C.F.R. 214.404-1).[1] Both sections 15.206 and 14.404-1 have similar elements ("substantial" amendment and "compelling reason").

FAR 15.206, applicable to negotiated procurements such as the one in this case, provides in relevant part:

> (a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.
> . . .
> (e) If, in the judgment of the contracting officer, based on market research or otherwise, an amendment proposed for issuance after offers have been received is so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition.

FAR 14.404-1 also applicable to this case because DoAF opened the bids by posting them online, provides, in relevant part:

> (a)(1) Preservation of the integrity of the competitive bid system dictates that, after bids have been opened, award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation.
> . . .
> (c) Invitations may be cancelled and all bids rejected before award but after opening when, consistent with paragraph (a)(1) above, the agency head determines in writing that-
>
> (1) Inadequate or ambiguous specifications were cited in the invitation;
> (2) Specifications have been revised;

[1] As an initial matter, the applicable DFAR, 48 C.F.R. 214.404-1, provides solely that "the contracting officer shall make the written determinations required by FAR 14.404-1 (c) and (e)." When the Air Force decided to cancel the solicitation, it purported to make a written determination under FAR 14.404-1(c), and no determination has yet been made under FAR 14.404-1(e). Likewise, FAR 15.206(a) calls for an amendment to the solicitation before a determination is made as to cancellation, and that has also not occurred.

No other compelling reasons listed in subsection 14.404-1(c) are even potentially supported by the Administrative Record submitted by Defendants in Dkt #13. No findings even potentially relevant to those other eight reasons were made at the time the decision to cancel was made.

To prevail on its claim that DoAF's cancellation of the solicitation was not in accordance with law, RKR must produce evidence that the alleged amendment to the solicitation was not "substantial", or that any allegedly "revised," "inadequate," or "ambiguous" specifications do not differ from the original specifications.

Evidence tending to explain the lack of difference exists in the form of[2]:

**1. Documents necessary to explain the solicitation, so that its true requirements are known and can be compared to the "revised" requirements.**

(a) Circular A-76 (1999 and 2003 versions)

Circular A-76 is the procurement policy document that the Air Force was acting under for the procurement in this case. While it creates no enforceable rights, it explains how the procurement in this case was supposed to occur—in particular, how a solicitation is to be cancelled and the cost comparison relevant to RKR's claim for the contract award.

(b) Air Force Instruction (AFI) 38-203

AFI 38-203 is an agency policy statement and directive regarding the Air Force Commercial Activities Program. AFI 38-203 governs "competitive sourcing using either the cost comparison or direct conversion process," at ¶ 1.7.4, and contains policy for

---

2 The classification of evidence to the broad categories shown in **bold** is solely for purposes of brevity and "best fit" and is not intended to indicate that a given item of evidence would not apply to other categories shown herein.

issuance of solicitations, cost comparison, development of in house cost estimates, and bid evaluation.

(c) Air Force Instruction (AFI) 33-115

AFI 33-115 is an agency policy statement and directive in three volumes which are regularly updated (Vol. 1 dated May 24, 2006; Vol. 2 dated Oct. 25, 2006; and Vol. 3 dated Apr. 15, 2004). AFI 33-115 "provides the overarching policy, direction, and structure for the Air Force Global Information Grid (AF-GIG)," to include the prior AETC NOSC and current AFNetOps command structures. AFI 33-115V1 at ¶ 1.1.1 and ¶ 1.2. There is no sensitive information in AFI 33-115. Rather, it is essentially a giant organization chart describing personnel structure for the network operations programs. AFI 33-115 is significant to the cancellation claim because the Air Force alleges that its changing requirements for network operations, presumably reflected in AFI 33-115, necessitated the cancellation of the solicitation in this case.

(d) Air Force Records and Information Management (AFRIMS) Records Disposition Schedule

The AFRIMS Record Disposition Schedule shows that Air Force wide AFI-type directives may not be used once a superseding version is published. Thus, once the AFIs listed above were issued, the Air Force may not rely on a prior version of those AFIs simply because they were in effect during an earlier portion of the bid process.

(e) Air Force Instruction (AFI) 33-115V1 (July 1999)

This earlier version of Vol. 1 of AFI 33-115 is the manual that describes what work was to be done in the Network Control Center in the solicitation in this case. It is shown by reference in Section 7 Appendix A (Amendment 12). RKR contends that these requirements have not been substantially changed.

**2. Documents explaining agency structure, such that the references to changes in agency organization made by DoAF to justify the cancellation after May 2007 are shown to be irrelevant, inapplicable, or false.**

(a) Air Force Doctrine Document 2-8 (June 2007)

Air Force Doctrine Document 2-8 is an agency guidance document for all "command and control" operations, to include network operations and information management. RKR's bid and the original solicitation are consistent with the objectives in this document, whereas the alleged justifications given by DoAF for cancelling the solicitation are in conflict with this document.

(b) Draft Implementation Plan for AETC Consolidated Help Desk (Nov. 20, 2006)

As part of the reorganization of Air Force network and telecommunications operations anticipated by RKR and the original solicitation, the Air Force drafted a detailed organizational chart, floor plan, and staffing requirements for the "help desk" portion of the operations. Some of the largest changes in staffing requirements alleged by DoAF are alleged to occur in the help desk component of the solicitation. This Draft Implementation Plan needs to be probed to determine to what extent DoAF relied on it and when, to what extent DoAF now disclaims it and why, and whether it is consistent with the original solicitation, the DoAF's alleged justifications for cancellation, or both.

(c) Draft Consolidation of Operations Plan for AETC Reengineering and Consolidation of Network and Telephone Operations (Nov. 20, 2006)

This is the umbrella document for the reorganization of AETC network and telecommunications operations anticipated by RKR and the original solicitation. This plan essentially describes in which program areas and to what degree "chairs on the deck" will be moved around. The consolidated help desk referred to above is one

component of this plan. Again, RKR will show that the requirements of the original solicitation are not substantially changed by this plan.

(d) Draft Consolidation of Operations Plan for AETC Reengineering and Consolidation of Network and Telephone Operations (Apr. 24, 2003)

This is a prior version of the Nov. 20, 2006 umbrella document for the reorganization of AETC network and telecommunications operations, and is expressly incorporated on page 7 of the Nov. 20, 2006 version. This plan essentially describes in which program areas and to what degree “chairs on the deck” will be moved around. The consolidated help desk referred to above is one component of this plan. The April 24, 2003 version is prior to the final release of the Keesler Little BOS solicitation. RKR believes that this document will show greater detail on what AETC had planned for the “NOSC centric” or reorganization initiative which is mentioned in the solicitation and will therefore further support RKR’s case that the reorganization into AFNetOps is really not anything different than what was already planned prior to the solicitation.

(e) NCC Reengineering Powerpoint Presentation, Randy Coleman, HQ-USAF (June 3, 2004)

Mr. Coleman’s Powerpoint presentation discusses the ongoing plans for the reorganization of Air Force network and telecommunications operations, and specifically identifies the solicitation in this case (Keesler AFB) as scheduled to be awarded consistent with those plans (Slide 8). In other words, Mr. Coleman, cognizant of the ongoing reorganization plan, saw nothing on the horizon that would result in cancellation of the solicitation in this case.

(f) Joint Expeditionary Force Experiment 2006 Guidebook

Page 4 of this guidebook establishes the existence of AFNetOps under the centralized control of the Eighth Air Force as of November 2003. In other words, this is an additional piece of evidence establishing that the DoAF had a long term reorganization plan that it was implementing well prior to the time period between May and August 2007, when DoAF alleges its position suddenly changed.

(g) Protecting Our Networks: Joint and Service Perspectives, Powerpoint Presentation, Rob Thomas, Ofc. of Secretary of the Air Force, May 19, 2005

Slides 9 and 11 of Mr. Thomas' Powerpoint presentation give a fairly concise representation of how the hierarchy in the chain of command *above* the network control centers (NCCs) would change as a result of the reorganization of Air Force network and telecommunications operations, yet would leave the NCCs themselves—the primary focus of the solicitation in this case—relatively unchanged.

(h) Prior Unit Manning Documents for Solicitation

Tab 10 of Dkt #13 contains a Unit Manning Document (UMD) printed on July 31, 2007. These are two earlier versions of the Unit Manning Document (Jun. 13, 2002 and Mar. 21, 2003), offered to show the lack of substantial change. The two earlier UMDs from 2002 and 2003 were released with the solicitation and intended as guidance for bidders.

(i) Prior Keesler A-76 Study Functional Spreadsheet

Tab 8 of Dkt #13 contains an A-76 Study Functional Spreadsheet for the Keesler solicitation. This is an earlier version of that spreadsheet (Aug. 28. 2003), offered to show the lack of substantial change. As with the UMDs, this document was released with the solicitation to guide bidders.

(j) Organization Charts Prepared by RKR

Two organization charts setting forth RKR's assessment of the impact of the AFNetOps reorganization on the solicitation. These documents may not have been before the agency but need to be admitted into evidence at some point to allow RKR to effectively present its case regarding the requirements of the solicitation.

(k) Tables Prepared by RKR

Two sets of identical tables setting forth RKR's assessment of the impact of DoAF's reorganization plans on the solicitation. These documents may not have been before the agency but need to be admitted into evidence at some point to allow RKR to effectively present its case regarding the requirements of the solicitation.

**3. Deposition testimony explaining DoAF's alleged justifications provided in writing during the GAO bid protest**

(a) GARY R. ALLEN and FRCP 30(b)(6) witness/es who provided the background information to Mr. Allen as a basis for the six reasons stated thus far for cancellation of the solicitation.

Gary R. Allen is an essential witness. The record shows that the initial decision to cancel the solicitation, as reflected in letters dated July 2 and July 9, 2007, and signed by Mr. Allen, was either made by Mr. Allen, and/or unnamed and unidentified party/ies, who are hereby requested as witnesses pursuant to FRCP 30(b)(6). The record contains no information showing that any government official besides Mr. Allen made this decision, or considered any of the five initial reasons Mr. Allen gave to the GAO for canceling. From the record, it is arguable that Mr. Allen is the government official proposing the alleged "corrective action" to cancel the solicitation and documenting the decision in two separate letters.

In his first letter dated July 2, 2007, Dkt #13 Tab 5, Mr. Allen abruptly gave notice of the Air Force's decision to cancel without any explanation or supporting documentation. In his second letter, dated July 9, 2007, Dkt #13 Tab 7, following inquiry from RKR and the GAO to explain reasoning for the July 2d suggestion of cancellation, Mr. Allen gave five reasons for cancellation to the GAO. These five reasons all related generally to alleged ambiguities in the solicitation and amendments.

It was only later, after the GAO questioned Mr. Allen's decision letters in such a critical manner as to give the impression that the GAO may have been viewing Mr. Allen's five grounds (for his proposed "corrective action" of cancellation) with skepticism, that Mr. Allen obtained a third letter from Major General Lord and submitted it to the GAO on August 2, 2007. Compare GAO Request for Additional Information, Dkt #13 Tab 11, with Letter of Maj. Gen. William T. Lord, Dkt #13 Tab 12. Maj. Gen. Lord's belated letter cited none of the grounds for cancellation listed in Mr. Allen's letters, and, thus, appears to be a pretext for the government's real motive for cancellation. General Lord's letter asserts that the needs of the Air Force have drastically changed, apparently between July 9 and August 2, and after the GAO seemed to express skepticism of the Air Force's initial position. As RKR plans to show that the factual assertions in General Lord's letter are unsound, incomplete and without proper authority, it is absolutely essential to depose the government official who made the decision to cancel the first time, on the grounds stated in the letter signed by Mr. Allen. Mr. Allen is the only logical official for that task.

Moreover, Mr. Allen stated in his August 2, 2007 letter to the GAO that General Lord's letter is to be read in addition to the five grounds listed in Mr. Allen's letters, all

of which were effectively subsumed into General Lord's purported reason and further effectively gutted of any legal force and effect, except for some possible purpose of argument on related issues. See Dkt #13 Tab 12 at 1 (stating, "This will serve as an additional notice of corrective action" and attaching General Lord's letter). This underscores the additional need for RKR to depose the individuals who may have provided the background for any part of the decision to take the alleged "corrective action" of canceling based upon Mr. Allen's initial five grounds and they will be similarly identified in the Fed. R. Civ. P. 30(b)(6) notice for their deposition as identified herein for Mr. Allen's deposition.

(b) MAJOR GENERAL WILLIAM T. LORD and FRCP 30(b)(6) witness/es who provided the background information to him in the preparation of his undated memorandum introduced in the Administrative Record through Mr. Allen's August 2, 2007 cancellation letter.

Maj. Gen. Lord is a key witness to explain how the four documents entered by Defendants into the administrative record played a role in his decision to recommend cancellation of the solicitation, (as noted in the next subsection) whether any other factors entered into decision, and whether he was aware of evidence produced by DoAF contrary to the alleged basis for his decision.

His testimony is crucial to inform the Court of his position in the solicitation process and his authority, or lack thereof, to issue an order to cancel the solicitation. He has stated that the solicitation no longer meets the Agency's requirements by referring only to the AFNETOPS portion of the solicitation. Testimony is needed to determine his understanding of what the solicitation is, what the AFNETOPS reorganization plan is and its relationship to the solicitation, and the knowledge he possessed regarding the fact that he is recommending the cancellation of a solicitation that had been recommended to be

awarded within a two month period prior by the Vice Commander of AFNetOps and for which there had been no information provided previously to support that the solicitation did not meet the agency's requirements.

Deposition of Maj. Gen. Lord will also afford him an opportunity to explain, based on the documents he claims to have relied upon, how he came up with the 57% change in the staffing requirement referred to in his memorandum. It is critical that Maj. Gen. Lord be requested to explain his consideration of the cost savings available to DoAF through the solicitation because it is not supported by any document produced in Dkt #13. Maj. Gen. Lord must also explain why the solicitation and resulting contract would not be able to deal with any changes that might be necessitated by what he claims are different requirements. He must inform the Court why initiatives for communications requirements that were announced in 2003 and were known by contracting authorities and integrated into the solicitation no longer meet the Agency's "requirements," and what offices he coordinated with at the DoAF/DoD and subordinate levels to confirm agreement with his advice to cancel. This underscores the additional need for RKR to depose the individuals who may have provided the background for any part of the decision to take the alleged "corrective action" of canceling solicitation and they will be similarly identified in the Fed. R. Civ. P. 30(b)(6) notice for their deposition as identified herein for Maj. Gen. Lord's deposition..

**4. Testimony regarding the documents in subsections #1-2, *supra*.**

The documents that RKR requests be made a part of the Administrative Record in subsections #1 and 2, *supra*, conflict with the alleged justifications for cancellation offered by Defendants. They are for the most part Defendants' own documents. The

inconsistency between the documents and the decision must be probed so that RKR can offer to the Court whether the decision can be explained at all, and move for appropriate relief thereafter. Depositions requested include:

(a) MAJOR GENERAL WILLIAM T. LORD and FRCP 30(b)(6) witness/es who provided the background information to him in the preparation of his undated memorandum introduced in the Administrative Record through Mr. Allen's August 2, 2007 cancellation letter.

For the reasons given in subsection 3(b), *supra*.

(b) RON MORTAG, Contracting Officer for the Solicitation

Mr. Mortag is responsible for ensuring that the work statements accurately reflect the Agency's requirements. His testimony is needed to establish: 1) the history of the Keesler solicitation regarding the NOSC centric initiative; 2) his part, if any, in the cancellation process; 3) his intent with regard to his answer to Question # T-07-046, that is repeatedly referred to as a critical issue in RKR's challenge to the award of the solicitation; 4) how AFNetOps applies to the contract; and, most importantly, 5) to inform the Court of the manner in which the solicitation will meet the requirements of the Air Force over the 11 year life cycle of the contract and how the workload changes will be addressed under the solicitation.

(c) MR. RANDY COLEMAN – HQAETC/SCXS

Mr. Coleman is/was the AETC NCC Reengineering Program Manager, and has full knowledge regarding all facets of the AETC NCC Reengineering effort as referenced in the Functional Concept and the Program Action Directive, which were entered as part of the Administrative Record in this case by Defendants in Dkt #13 Tabs 3 and 15. The AETC NCC reengineering initiative was a significant element in the Keesler Little BOS solicitation. Mr. Coleman's testimony will establish: 1) the change over date from

AETC NOSC to AFNETOPS and the manner of the change as planned under the solicitation; 2) the difference in operation between the AETC NOSC and AFNETOPS, if any; 3) the effect on the NCC at Keesler as a result of any changes in the NOSC/AFNETOPS; 4) the history of the operation and planning for the AETC consolidated help desk.

(d) LT COL HELEN LENTO – SAF/SCTX

Lt. Col. Lento is identified on Maj. Gen. Lord's undated cancellation memorandum included as part of DoAF's Aug. 2, 2007 response in the GAO bid protest, Dkt #13 Tab 12, as the individual for questions to be directed to regarding this memorandum. Considering her ability to answer the questions related to the memorandum she is a key witness in this matter to identify the background and development of the memorandum.

(e) BRIG. GEN. PAUL CAPASSO – 81st Training Wing, Keesler AFB

General Capasso, as Commander of the 81st Training Wing at Keesler AFB will testify to the post-Katrina analysis of support service requirements at Keesler AFB and related Air Force requirements for the both the Big BOS and Little BOS solicitations. After Keesler recovered and stabilized after the effects of Hurricane Katrina, General Capasso is the individual who specifically requested through the chain of command for the Kessler A-76 process to continue. *See* subsections 5(d)-(e), *infra*.

*ii. Arbitrary and Capricious*

The procuring agency need only provide "a coherent and reasonable explanation of its exercise of discretion and the disappointed bidder bears a heavy burden of showing

that the award decision had no rational basis." *Cygnus Corp. v. U.S.*, 72 Fed. Cl. 380, 384 (2006). Unless it is without reason, the agency's decision should not be disturbed. *Id*.

The agency has an alleged reason, stated in the August 2 letter of Maj. Gen. William T. Lord, *see* Dkt #13 Tab 13, but because that reason cannot be squared with the evidence that was in the administrative record before it at the time, there is no rational basis for the cancellation.

To prevail, RKR must produce evidence supporting its argument that the cancellation was irrational.

Evidence tending to explain the lack of rational basis exists in the form of:

5. **Documents necessary to explain the position of Maj. Gen. John W. Maluda in May 2007**.

(a) Keesler Air Force Base Administrative Appeal Response, May 29, 2007.

The May 29, 2007 position of Maj. Gen. Maluda denying RKR's administrative appeal and stating that the contract would be awarded to the MEO is in obvious tension with the position of Maj. Gen. Lord six weeks later on Aug. 2, 2007 stating that the solicitation would be cancelled.

(b) Barksdale Air Force Base Newspaper, THE BOMBARDIER, Aug. 11, 2006 p.1 (recording promotion of Maj. Gen. John W. Maluda to Commander of Air Force Network Operations [AFNetOps]).

This article provides foundation for RKR's factual claim that Maj. Gen. Maluda was the recognized expert on AFNetOps prior to and at the time of his May 2007 decision, and at all times thereafter.

(c) Keesler Air Force Base Administrative Appeal Team Response for Big BOS solicitation, May 17, 2007.

DoAF had two A-76 solicitations ongoing at Keesler Air Force Base simultaneously: one for the Little Base Operating Support (Little BOS) that is the subject of this case, and larger one known as the Big BOS. The two solicitations did not overlap. In the Big BOS solicitation, DoAF selected the bid of its civilian contractor (the MEO), over the administrative appeal of the American Federation for Government Employees. At pages 2-3 of the administrative appeal decision, DoAF expressly denies the Federation's point of error alleging changed circumstances at Keesler Air Force Base as a result of Hurricane Katrina. By contrast, DoAF is relying on changed circumstances due to Hurricane Katrina in its intent to cancel the Little BOS solicitation.

(d) Keesler News, Aug. 17, 2006 at 1 and 9.

This article discusses the history and pending outcome of the A-76 Study at Keesler Air Force Base and references a post-Katrina analysis of support service requirements at the base.

(e) Request to Resume Competitive Sourcing Process and Post-Katrina Analysis of Support Service Requirements at Keesler AFB, and all documents responding or commenting on them.

These documents, prepared by Brig. Gen. Paul Capasso prior to May of 2006, were cited in the Keesler News on Aug. 17, 2006, as being sent up the chain of command. The mere existence of these documents outside of the Administrative Record filed by Defendants presents a clear potential for conflict with DoAF's alleged justifications for cancelling the solicitation.

6. **Documents explaining agency structure, such that the references to changes in agency organization made by DoAF to justify the cancellation after May 2007 are shown to be irrelevant, inapplicable, or false.**

Requested as part of subsections 1, 2, and 5, *supra*.

**7. Testimony from Maj. Gen. John W. Maluda regarding agency structure and his written denial of RKR's administrative appeal in May 2007.**

Maj. Gen Maluda's testimony is necessary to establish: 1) why he recommended award of the contract to the MEO given his background with AFNetOps; 2) when he first found out about the alleged changes argued by Mr. Allen and Maj. Gen Lord in July and August 2007; 3) the advice he received in preparation of the administrative appeal response; 4) his knowledge of the Performance Work Statement of the solicitation and the steps he took to assure the cost comparison for the solicitation was fair, accurate and properly calculated, and 5) the scope and effect of DoAF's ongoing reorganization of network operations.

**8. Testimony from Maj. Gen. William T. Lord regarding his relationship to and communications with Maj. Gen. Maluda and anyone else in DoAF with authority over AFNetOps after May 2007.**

Requested as part of subsection 3(b), *supra*.

**9. Any drafts of Maj. Gen. Lord's Aug. 2 memo and anything else that existed that he might have relied on to know that the solicitation requirements were going to change and by how much. Defendants should be willing to certify or answer "no documents" to this request, beyond what is already in the record.**

*iii. Bid Protest Merits*

To prevail on the merits of its bid protest, in addition to showing a "significant error in the procurement process," a disappointed bidder must also show that it was prejudiced by the error. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996). To show prejudice, the disappointed bidder must demonstrate "that there was a substantial chance it would have received the contract award but for that error." *Id*. at 1582.

RKR will establish that prejudice because there was a substantial chance it would have been awarded the contract absent the cancellation. RKR was the bidder the agency selected to compete against the agency's own MEO in the A-76 bid process.

"To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." *Alfa Laval Separation v U.S.*, 175 F.3d 1365 (Fed. Cir. 1999). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582; *see CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed.Cir.1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "there was a substantial chance that [it] would receive an award-that it was within the zone of active consideration").

To prevail on the merits of its bid protest, RKR must produce evidence that there was an error based on agency action that was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, and that there was a substantial chance it would have been awarded the contract, either because:

(aa) the MEO did not satisfy the original requirements; or

(bb) the other factors as alleged by RKR in its administrative appeal and GAO bid protest make RKR the low bidder over the MEO.

Evidence tending to explain RKR's entitlement to the contract exists in the form of:

**10. For reason (aa), the MEO's bid and evaluation, when combined with the evidence noted in items 1-8 in the arbitrary/capricious or not in accordance with law sections above. The evaluation includes:**

(a) The in-house cost estimate called for by Circular A-76, p. 10 ¶ A.3 (1999)

(b) Any annual report to the Office of Management and Budget provided for by Circular A-76, p. 10 ¶ A.4 (1999), explaining why the in house cost estimate called for by Circular A-76, p. 10 ¶ A.3 (1999) was not timely completed.

(c) The MEO Operational Audit

This document is part of the MEO's bid package and/or bid evaluation and is necessary to determine if the MEO could have in fact complied with the solicitation at all.

The MEO Operational Audit will show that the MEO staffed the network control center (NCC) using anticipated reorganization as the basis of the 93% reduction in that area (69 to 6). It thus also shows that cancellation was improper.

(d) MEO Management Plan and Costing Volume

These documents are part of the MEO's bid package and/or bid evaluation and are necessary to determine if the MEO could have in fact complied with the solicitation at all.

The MEO management plan:

- Contains the same or similar documents that the Air Force recently provided the court as the documents General Lord used to reach his determination. This shows that the same percent of people were affected by the AETC NOSC "initiative" as is affected by the AFNetOps reorganization. The AETC NOSC "initiative" and AFNetOps reorganization are merely different labels for an overall Air Force telecommunications and network reorganization plan that affected this particular solicitation in substantially the same way. Even the GAO conceded that "The Air Force's centralization initiative is referred to throughout the record by either the term "AFNetOps" or "NOSC-centric" There is no dispute that both terms refer, generally, to the centralization concept."

- Contains information which proves beyond doubt that the MEO relied upon the AETC NOSC initiative. This is significant because it also proves beyond any doubt that, even if one were to accept the argument that the AFNetOps reorganization is a "substantial" change, (which RKR does not) it still is not a change that was not "anticipated". In fact, the MEO's actually including the initiative and attempting to staff for the initiative is evidence that all bidders anticipated the eventual implementation of the initiative. Therefore, the change is not so substantial that other offerors would likely have submitted proposals. The initiative was clearly included.

- Contains information which will prove that the 57% figure used by Maj. Gen. Lord affects the very same number of people as did AETC NOSC and is not the proper way to calculate the affect of AETC NOSC or AFNetOps.

(e) Documents relevant to the actual cost comparison or cost evaluation of the MEO's bid, to include:

(i) The final Cost Comparison File bearing the Independent Review Officer (IRO) signature.
(ii) The COMPARE Study File including passwords current as of the date of bid closing.
(iii) The COMPARE Study files including passwords prior to final tax update.
(iv) The COMPARE Study files including password at time of certification by Air Force Audit Agency.
(v) Any and all working papers developed by the Commercial Activities Team that support the MEO and In-House Cost Estimate.
(vi) The interim and final IRO review statements or memoranda identifying problems requiring corrective action (s) and documentation of the implemented corrective action.
(vii) Any and all correspondence with the Air Force Audit Agency concerning this solicitation including the certification of the MEO proposal.

**11. For reason (bb), the record of the GAO bid protest which is already part of the Administrative Record, and:**

(a) RKR's administrative appeal, which is not yet part of the Administrative Record.

(b) The Contracting Officer's signed statement of relevant facts, including a best estimate of the contract value, and a memorandum of law. Any documents by the Contracting Officer which set forth findings, actions, and recommendations, and any additional evidence or information not provided in the protest file that may be necessary to determine the merits of the protest; and any list of parties being provided the documents.

These documents from the Contracting Officer are required to be prepared when a protest is filed with the GAO, *see* [FAR] 48 C.F.R. 33.104(a)(3)(iv)(B) and (C), but they was not included as part of the Administrative Record from the GAO protest.

**C. General Requests**

12. Leave from the Court to request that DoAF authenticate as true and correct copies of DoAF origin all documents requested in subsections B.1-11 above.

V. CONCLUSION AND REQUEST FOR RELIEF

RKR respectfully requests leave to supplement the Administrative Record filed in Dkt #13 with the foregoing exhibits; leave to notice the foregoing proposed depositions and document requests; and leave to supplement the Administrative Record filed in Dkt #13 with the results of those depositions and document requests.

DATED September 14, 2007

Respectfully submitted,

/S/

David F. Barton, Attorney-in-Charge
State Bar No. 01853300
**THE GARDNER LAW FIRM**
745 E. Mulberry Avenue, Suite 100
San Antonio, Texas 78212-3149
Telephone: (210) 733-8191
Telecopier: (210) 733-5538
E-Mail: dfb@tglf.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been forwarded in compliance with the Federal Rules of Civil Procedure to all counsel of record as set out below, on this the 14th day of September, 2007, as follows:

Will Rayel
Trial Attorney
National Courts Section
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW, Room 12100
Washington, DC 20530 (20005 for FedEx)
phone: (202) 616-0302
facsimile: (202) 307-0972

***VIA E-FILING***

/S/

DAVID F. BARTON